FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
November 13,
JEFFREY P. COLWELL, CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01945-WJM-CBS

**TYLER SANCHEZ**

      **Plaintiff,**

**v.**

**DETECTIVE JOE RYAN HARTLEY,**
**DETECTIVE RYAN WOLFF,**
**DETECTIVE MIKE DUFFY,**
**DETECTIVE HEATHER MYKES, and**
**INVESTIGATOR MICHAEL DICKSON, in their individual capacities,**
**BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY,**
**DOUGLAS COUNTY SHERIFF'S OFFICE, and**
**OFFICE OF THE DISTRICT ATTORNEY FOR THE EIGHTEENTH JUDICIAL**
**DISTRICT,**

      **Defendants.**

_____

### SECOND AMENDED COMPLAINT AND JURY DEMAND
_____

Plaintiff Tyler Sanchez, for his Second Amended Complaint and Jury Demand, alleges the following:

### I. **INTRODUCTION**

1.    This suit arises from the malicious prosecution of Tyler Sanchez, a cognitively disabled 18-year-old boy, by four Douglas County Sheriff's Office Detectives and a District Attorney's Office Investigator, beginning in July of 2009.  Mr. Sanchez was arrested, interrogated intermittently for 38 hours, and charged for a sexual assault and trespass he did not commit because the individual Defendants knowingly and

EXHIBIT A

intentionally coerced confessions from him despite awareness of his obvious

disabilities.  Mr. Sanchez was ultimately jailed for four months---much of it in solitary

confinement because his disabilities put him at risk of harm from other inmates---then

subjected to GPS monitoring and limitations on his geographic movements until April of

2012, nearly three years after his arrest.  At that time, all charges against Mr. Sanchez

were finally dropped due to Douglas County's admission that his statements were the

product of the officers' coercive interrogations and Mr. Sanchez's disabilities, and could

not support a finding of guilt.

## II.  JURISDICTION AND VENUE

2.      Jurisdiction is proper in this Court pursuant to 42 U.S.C. §§ 1983 and

1988, and 28 U.S.C. §§ 1331 and 1343.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b),

because the unlawful practices alleged herein were committed within the District of

Colorado.

## III.  PARTIES

4.      Plaintiff Tyler Sanchez resides within the District of Colorado.

5.      Defendant Joe Ryan Hartley was a Detective with the Parker Police

Department assigned to the Douglas County Sheriff's Office Pattern Crimes Unit at all

relevant times and resides within the District of Colorado.  Detective Hartley is being

sued in his individual capacity.

6.      Defendant Ryan Wolff was a Detective with the Parker Police Department

assigned to the Douglas County Sheriff's Office Pattern Crimes Unit at all relevant times

and resides within the District of Colorado.  Detective Wolff is being sued in his individual capacity.

7.      Defendant Mike Duffy was a Detective with the Douglas County Sheriff's Office at all relevant times and resides within the District of Colorado.  Detective Duffy is being sued in his individual capacity.

8.      Defendant Heather Mykes was a Detective with the Douglas County Sheriff's Office at all relevant times and resides within the District of Colorado. Detective Mykes is being sued in her individual capacity.

9.      Defendant Michael Dickson was employed as an Investigator with the Office of the District Attorney for the Eighteenth Judicial District at all relevant times and resides within the State of Colorado.  Investigator Dickson is being sued in his individual capacity.

10.      Defendant Board of County Commissioners of Douglas County is a body corporate and politic that may be sued under Colorado law.  The County enforces State and local laws through the Douglas County Sheriff's Office in Castle Rock, Colorado.

11.      Defendant Douglas County Sheriff's Office is a body corporate and politic that may be sued under Colorado law.

12.      Defendant Office of the District Attorney for the Eighteenth Judicial District is a body corporate and politic that may be sued under Colorado law.

## IV.  FACTUAL ALLEGATIONS[1]

13.      Plaintiff Tyler Sanchez was born on July 23, 1990, and was eighteen years old at the time this story began in July of 2009.  Mr. Sanchez was born in Denver,

---

[1] Allegations in this Complaint are made upon information and belief.

Colorado, raised in Parker, Colorado, and currently resides in Parker, Colorado.  Mr. Sanchez lives with his mother, father, brother, and two dogs.

14.     Mr. Sanchez is cognitively and developmentally disabled.  Specifically, Mr. Sanchez suffers from a mixed receptive-expressive language disorder, borderline intellectual functioning, auditory processing deficits, social anxiety, submissive personality characteristics, and hearing impairment.   His I.Q. tests in the 60s and 70s.  He also suffers from a seizure disorder, which requires him to take medication that impairs his memory.

15.     This combination of disorders impacts Mr. Sanchez's ability to listen, comprehend, understand, communicate, and apply abstract concepts.  Additionally, Mr. Sanchez has problems with cognitive demands under time pressure, problems working with memory, and possesses auditory processing deficits.  He also has problems comprehending vocabulary and grammar.  His disabilities greatly impact his ability to communicate verbally and non-verbally to others.  His disorders particularly manifest themselves under pressure, stress, questioning by authorities, and sleep deprivation.

16.     Mr. Sanchez's disorders make it difficult for him to provide accurate information in response to questioning by authority figures and make him particularly susceptible to making false and inculpatory statements at the suggestion of authority figures.

17.     Mr. Sanchez's disabilities are open and obvious.  He presents as a significantly younger person than his actual age.  His inability to understand questions and provide appropriate responsive information, as well as his reduced intellectual

functioning, are obvious to anyone who speaks with him.  It is obvious that he is susceptible to suggestions made by authority figures.

18.     On July 10, 2009, a mother made a 911 call to the Douglas County Sheriff's Office.  The caller told the dispatcher that someone had broken into her home through her eight-year-old daughter's window and had sexually assaulted the young girl.

19.     The eight-year-old girl described the intruder as an older man, about 40 years old, the same size and build as her father who weighs 190 pounds, with brown hair parted in the middle, who was not wearing a hat, did not have any tattoos on his hands or arms, and had white skin.

20.     Other than the color of his skin, Tyler Sanchez does not even bear a close resemblance to the intruder.  Tyler Sanchez was eighteen years old at the time and looked his age or younger.  Mr. Sanchez weighs 125 to 130 pounds and has a very thin build.  Mr. Sanchez's hair is red and was cut in a close buzz cut at the time.  Mr. Sanchez had two obvious tattoos on his forearms, one reading "Sanchez" and one reading "Michelle," his girlfriend's name.

21.     On July 17, 2009 at approximately 12:40 a.m., Detectives Ryan Wolff and Joe Ryan Hartley of the Parker Police Department and Douglas County Sheriff's Office responded to a call regarding a prowler on the 9300 block of Branham Drive in the Stonegate neighborhood (the "Branham Drive trespass").  The Detectives learned that the silhouette of a male wearing black clothing was observed in a back yard by a homeowner and ran from the back yard after seeing the homeowner through a window.

22.     Beginning at about 1:18 a.m., Detectives Wolff and Hartley interviewed Mr. Sanchez in the driveway of his home about the Branham Drive trespass.  Another

Douglas County Sheriff's Office Detective, Jason Cirbo, was also in the driveway during the interview. The Detectives noted that Mr. Sanchez appeared very nervous and was sweating. While the Detectives were questioning Mr. Sanchez, multiple police vehicles pulled up around the house.

23.     While interviewing Mr. Sanchez, Detectives Wolff and Hartley repeatedly suggested to Mr. Sanchez specific details about the Branham Drive trespass, then asked Mr. Sanchez to describe the incident back to them. Detectives Wolff and Hartley had to ask Mr. Sanchez repeated questions before he allegedly described the crime by confirming or repeating back the information he was provided by the Detectives.

24.     Based on Mr. Sanchez's affect, difficulty in understanding questions, difficulty in answering questions, and general demeanor in this interview, Detectives Wolff and Hartley knew that Mr. Sanchez suffered from some type of mental impairment and limited intelligence. They knew that Mr. Sanchez was not capable of providing accurate information in response to their questions and that Mr. Sanchez was susceptible to pressure to agree with statements they made to him. As a result, they knew that Mr. Sanchez's statements were not knowing or voluntary and had been coerced.

25.     Based on his alleged responses to Wolff's and Hartley's questions, Mr. Sanchez was placed in handcuffs and arrested for second degree criminal trespass, without a warrant, and transported to the Douglas County Jail.

26.     At the Jail, Mr. Sanchez was read his <u>Miranda</u> rights and was also provided them in written format. Even though he did not understand the verbal or written statement of rights, Mr. Sanchez signed the waiver.

27.     Beginning at about 2:20 a.m. on July 17, 2009, Detectives Wolff and Hartley then interviewed Mr. Sanchez in the booking room of the Douglas County Jail about the Branham Drive trespass as well as several other burglaries and trespasses that had taken place in the area that summer.  Even though Mr. Sanchez bore no resemblance to the perpetrator described in connection with the July 10, 2009 sexual assault of an eight-year old girl, Wolff and Hartley also interviewed Mr. Sanchez to determine whether he had been the perpetrator of that crime.  At the time they interviewed Mr. Sanchez, Detectives Wolff and Hartley knew that the sexual assault victim's identification of her assailant did not remotely match Mr. Sanchez.

28.     During the interview, Detectives Wolff and Hartley provided specific details about the Branham Drive trespass and the sexual assault to Mr. Sanchez and then asked him exclusively "yes or no" questions regarding whether he committed the criminal acts.  In response, Mr. Sanchez was unable to provide any details about the incidents.  Wolff and Hartley noted that Mr. Sanchez appeared unsure about what he supposedly did during each crime. At least one detail Mr. Sanchez falsely confessed to regarding the Branham Drive trespass--that he fled the yard when a porch light came on---was untrue according to the homeowner's own statement that he never turned a light on, but was suggested to Mr. Sanchez by the Detectives.  In addition to providing details to Mr. Sanchez, the Detectives intentionally led Mr. Sanchez to falsely believe that his DNA had been found in locations which implicated him in the crimes.

29.     During this interview, in response to "yes or no" questions, Mr. Sanchez admitted to entering the home where the sexual assault occurred; however, he denied sexually assaulting the little girl.  Mr. Sanchez's admissions were not knowing,

voluntary, or accurate.  Mr. Sanchez neither entered the home where the sexual assault occurred, nor committed the assault itself.

30.     During the interview, Mr. Sanchez also falsely confessed to other burglaries and trespasses under investigation by the Douglas County Sheriff's Office, including at least one in which Wolff and Hartley knew he did not remotely match the complainant's physical description of the actual perpetrator, who had "long, greasy black hair."

31.     Based on Mr. Sanchez's affect, difficulty in understanding questions, difficulty in answering questions, and general demeanor in this interview and the driveway interview, Detectives Wolff and Hartley knew that Mr. Sanchez suffered from some type of mental impairment and limited intelligence.  They knew that Mr. Sanchez was not capable of providing accurate information in response to their questions and that Mr. Sanchez was susceptible to pressure to agree with statements they made to him.  They also knew that Mr. Sanchez's multiple confessions were unlikely to be accurate given that they contradicted witnesses' descriptions of events.  As a result, they knew that Mr. Sanchez's testimony during their interview, as well as the earlier driveway interview, was not knowing or voluntary and had been coerced.

32.     In fact, Detectives Wolff and Hartley were so unsure of Mr. Sanchez's ability to provide accurate information that they asked him whether he truly committed the crimes to which he confessed, or was just saying what the Detectives wanted him to say.  Detective Wolff later wrote that during the interview, Mr. Sanchez often seemed "unsure of what he did during the commission of each crime," that he had trouble remembering things, and that his answers to questions were often "vague."  However,

Wolff and Hartley did not include this information in their July 17, 2009 Progress Report summarizing the interview.

33.     Wolff and Hartley's interview of Mr. Sanchez was video recorded, but the recording was destroyed while in the custody of the Douglas County Sheriff's Office and was never produced to Mr. Sanchez.  The destruction occurred after the Court ordered that video recordings relevant to the case be preserved.

34.     At 4:45 a.m. on July 17, 2009, Detective Cirbo signed a Statement in Support of Warrantless Arrest of Mr. Sanchez for the Branham Drive trespass which took place earlier that night.  Around the same time, Detective Cirbo signed a Misdemeanor Summons and Complaint for the Branham Drive trespass.  Detective Cirbo relied upon Hartley and Wolff's representations regarding their interviews of Mr. Sanchez, including their omission of any information about his obvious disabilities and their observations thereof.  As a result of these omissions, Detective Cirbo's Statement made no mention of any information suggesting Mr. Sanchez had any disabilities or limitations.

35.     Detectives Heather Mykes and Mike Duffy of the Douglas County Sheriff's Office were assigned to investigate the July 10, 2009 sexual assault.  Early on the morning of July 17, they were informed of Mr. Sanchez's answers to questions about the incident in his interview with Detectives Wolff and Hartley.

36.     Beginning around 7:37 a.m. on July 17, 2009, subsequent to the interview conducted by Detectives Wolff and Hartley, Detectives Mykes and Duffy interviewed Mr. Sanchez.  At the time the interview began, Mr. Sanchez had been awake since the morning of July 16, 2009---roughly 24 hours---with little or no sleep.  Detectives Wolff

and Hartley briefed Mykes and Duffy before they began their interview and provided them with a copy of the Progress Report authored by Hartley with Wolff's assistance.

37.     At the time they interviewed Mr. Sanchez, Detectives Duffy and Mykes knew that the sexual assault victim's identification of her assailant did not match Mr. Sanchez.  They also knew that Mr. Sanchez's blood alcohol content had just been tested and that the test came back showing no alcohol in his system, removing the possibility that his obvious impairments could be explained by intoxication.  From Detective Hartley's Progress Report, they knew that Mr. Sanchez had to be closely questioned during his earlier interviews on whether he was simply saying what he thought officers wanted to hear when he admitted to various criminal acts.

38.     At the beginning of the interview, Detective Duffy provided a verbal Miranda warning to Mr. Sanchez, which he did not understand.   Mykes and Duffy observed that Mr. Sanchez appeared very tired, yawned frequently, spoke with his eyes closed, and rested his head in his hands or on the table.  Mr. Sanchez stated multiple times throughout the interview that he was tired.  He informed the officers that he had only had two hours of sleep in the last two days.  He was observed to be extremely anxious and his legs frequently shook.

39.     Both Detectives observed that Mr. Sanchez had difficulty expressing himself verbally throughout the interview.  Many of Mr. Sanchez's responses to questions were non-verbal in nature, either a nod of the head "yes," shake of the head "no," or no response at all.  Mr. Sanchez also frequently responded with "I don't remember" or "I'm tired" when asked about the specific crimes in question.   He answered questions slowly and hesitantly, with obvious difficulty.

40.     At the outset of the interview, Mr. Sanchez expressed his extreme anxiety when talking to authority figures.  For example, when Detective Mykes asked if he was under the influence of drugs or alcohol, he said "No," and added, referring to Detectives Hartley and Wolff, "That's what they thought . . . when . . . I talked to them first, but . . ." Detective Mykes said, "The reason I'm asking is you seem . . . " and when she trailed off, Mr. Sanchez attempted to explain his disabilities and his fear of authority figures, stating, "I usually get hesitated when . . . I talk to . . . these kinds of people."  Mr. Sanchez also stated early on in the interview that "I can't stop shaking," "I can't even speak," and "I want to . . . I want to get out of here."

41.     Mr. Sanchez made an effort early in the interview to explain to Detectives Mykes and Duffy that he had been coerced by Hartley and Wolff into confessing to crimes he did not commit.  He explained, "I had to tell them a different story cuz they weren't being . . . they weren't being like . . . cooperative, saying I was lying" and that as a result, he had told Hartley and Wolff that "I went into somebody's backyard, which I didn't."  He also revealed that Hartley and Wolff had led him to believe they had DNA evidence connecting him to the crimes, stating that "somehow they got DNA fingerprints from -- I don't know.  It's just -- I give up."   Rather than correct this misimpression, Mykes and Duffy continued to intentionally lead Mr. Sanchez to believe that his DNA had been found at the house where the sexual assault occurred.

42.     Detectives Mykes' response was to tell Mr. Sanchez, "I know those guys [Hartley and Wolff] pretty well. . . I know they weren't forcing you to say what you said this morning.  I know that, okay?"  Later in the interview, Detective Mykes told Mr.

Sanchez it was "time to start talking," and he responded, alluding to his earlier false confessions, "this is what happened last . . . time with the other . . . two Detectives."

43.     Throughout the interview, Detectives Mykes and Duffy observed that Mr. Sanchez was behaving strangely, including laughing and smiling nervously at odd times; had a poor memory; and made numerous inconsistent statements.  When Detectives Mykes and Duffy pushed him to clarify his statements, he stated, "This is aggravating me . . . This is like . . . uh . . . cuz I just wanted to get home.  I don't want to be here."

44.     During the interview, Mr. Sanchez repeatedly had to ask the Detectives to repeat their questions because of his hearing impairment and cognitive disabilities.

45.     During the interview, Mykes and Duffy observed that Mr. Sanchez's ability to respond to questions was impaired.  As a result, they inquired a second time as to whether he had taken any drugs and alcohol, and Mr. Sanchez agreed to undergo a drug and alcohol test.  Later, at a third point in the interview, Detective Mykes told Mr. Sanchez she would be taking a urine sample because "I need to know that you're not on something," and Mr. Sanchez again tried to explain his disabilities, stating, "I'm like this most of the time anyways" and "People . . . ask questions if I'm on anything." Mykes later testified that her concern about drug or alcohol impairment arose because of her specific observations that Mr. Sanchez had difficulty remembering things, had difficulty formulating answers to questions, and was slow to answer questions.

46.     Toward the end of the interview, Mr. Sanchez offered to take a lie detector test.  Mykes and Duffy then pressed him on whether he actually committed the trespass and sexual assault.  Mr. Sanchez responded, "that's like . . . when I heard that . . . it's

everything going against me now.  Not even . . .  Cuz everything going against me.

Now things that I didn't even do.  Not unless I dreamed walk.  Unless I was dreaming"

and, later, "I've stayed up . . . for like . . . over thirty hours now.  I want to . . .  I haven't

got any answers."

47.     Based on Mr. Sanchez's affect, difficulty in understanding questions,

difficulty answering questions, and general demeanor, as well as Detectives Hartley and

Wolff's briefing, Detectives Mykes and Duffy knew that Mr. Sanchez suffered from some

type of mental impairment and limited intelligence.  They knew that Mr. Sanchez was

not capable of providing accurate information in response to their questions and that Mr.

Sanchez was susceptible to pressure to agree with statements made to him.  As a

result, they knew that Mr. Sanchez's testimony during his interview with them and prior

interviews with Hartley and Wolff was not knowing or voluntary and had been coerced.

48.     Mykes and Duffy completed their interview around 11:30 a.m. on July 17,

2009, at which point Mr. Sanchez had been awake for well over 24 hours.  Mr. Sanchez

went to sleep in the Jail at roughly 11:00 p.m. that night.

49.     During the afternoon of July 17, 2009, Detectives Mykes and Duffy

interviewed Brian Coshnitzke, an acquaintance of Mr. Sanchez.  Mr. Coshnitzke told the

Detectives that Mr. Sanchez "ain't all up there.  He -- he's different."  Later, he added,

"We used to call him Silent T."  Mykes then asked, "Let me ask a real quick question

about Tyler, 'cause he has some mannerisms that are a little interesting.  Does he kind

of phase off sometimes when you're talkin[g] to him?"  Duffy added, "Like zone out?"

Mr. Coshnitzke replied, "He was a weird kid, man."  Mykes later explained, "I was just

wonderin[g], 'cause like I said, when we talked to him, he kinda phased out a couple times."

50.     At about 7:00 a.m. on July 18, 2009, Mr. Sanchez's father Anthony Sanchez arrived at the Douglas County Jail to pay his son's bond.  For roughly four hours, Mr. Sanchez was prevented from making payment by Jail personnel who told him incorrectly that Ms. Sanchez was "still being processed" and he should "check back later," or that the computer system which processes bond payments was running slowly or was "down."  During this time, Anthony Sanchez observed other individuals leaving the Jail after bond was posted for them.  This incorrect information was given to Anthony Sanchez at the request of Detectives Mykes and Duffy.

51.     On July 18, 2009 at 8:45 a.m., Detectives Mykes and Duffy transported Mr. Sanchez from the Douglas County Sheriff's Office to the District Attorney's Office for a polygraph exam, to be taken by Investigator Mike Dickson.  On the instructions of Detectives Mykes and Duffy, Anthony Sanchez was never told by Jail personnel that his son was being transported to another jurisdiction or that he was being interrogated while his father waited to pay his bond.

52.     Before the polygraph started, Detective Mykes briefed Investigator Dickson on the case.  Dickson learned that the sexual assault victim's identification of her assailant did not match Mr. Sanchez.

53.     Before the polygraph started, Mr. Sanchez reported that he suffered from a seizure disorder which impaired his memory.  He also told Detectives Mykes and Duffy and Investigator Dickson that he has trouble talking when he gets nervous. Mykes and Duffy confirmed with Jail personnel that Mr. Sanchez was on seizure

medication.  In addition, Mykes, Duffy, and Dickson knew by this time that Mr. Sanchez could not be under the influence of any non-prescription drugs or alcohol, as he had been in custody for over 31 hours.

54.     Based on Mr. Sanchez's affect, difficulty in understanding questions, difficulty answering questions, general demeanor, and known seizure disorder, as well as Detective Mykes' briefing, Investigator Dickson knew that Mr. Sanchez suffered from some type of mental impairment and limited intelligence.  He knew that Mr. Sanchez was not capable of providing accurate information in response to his questions and that Mr. Sanchez was susceptible to pressure to agree with statements made to him.  As a result, he knew that Mr. Sanchez's statements during his polygraph interview and all prior interviews, as well as the written statement he produced during his polygraph interview with Investigator Dickson, were not knowing or voluntary and had been coerced.

55.     Investigator Dickson began by questioning Mr. Sanchez to develop questions for the polygraph.  While developing the questions, Dickson asked how much Mr. Sanchez knew about the sexual assault allegations.  Mr. Sanchez then repeated back almost verbatim what the four Detectives had told him during questioning the previous day.  Investigator Dickson then provided Mr. Sanchez with additional information regarding what he believed had happened during the sexual assault.

56.     Before administering the polygraph, Investigator Dickson noted that Mr. Sanchez seemed tired and was yawning frequently.  Throughout the polygraph interview and test, Dickson observed that Mr. Sanchez had difficulty understanding and answering questions.  During the interview, Investigator Dickson reinforced the

Detectives' repeated implication that Mr. Sanchez's DNA would be found at the scene of the sexual assault.

57.     While Mr. Sanchez's interview with Investigator Dickson was underway, around 11:00 in the morning, his father Anthony Sanchez was finally allowed to pay his bond.  Anthony Sanchez was told that it generally take about forty minutes for someone to be released from the Jail once bond is paid.  When his son had not appeared after an hour, he inquired, and was kept waiting with vague and conflicting excuses that the "system was slow" or the "computer was down" for several more hours.  Anthony Sanchez was never told that his son was being interrogated while he waited.  In fact, Anthony Sanchez was kept waiting not because of a system problem, but because of instructions from Mykes and Duffy that Mr. Sanchez could not yet be released.

58.     After administering the polygraph, Investigator Dickson informed Mr. Sanchez that he had failed the polygraph on two questions:  (1) "Did you touch that girl's vaginal area?" and (2) "Did you touch her between the legs?"  Mr. Sanchez responded despairingly, "But I don't remember doing any of this.  That's what I'm trying to say."

59.     Investigator Dickson then suggested that what Mr. Sanchez really meant to say was "It could have happened, but I don't remember."  Mr. Sanchez acceded to this suggestion.  He explained that "I fell asleep [on the night of the assault] and then I woke up -- I woke up that next morning in my bed," but went on, "I might have woke up [during the night] out of nowhere . . . And might have done that [the assault] because there's many -- there's many things I don't remember doing."  Pressed further, he

agreed that "I could have done it and . . . I just don't remember" and "I could have probably done it in my sleep."

60.     Contrary to his repeated assertions that he had no memory other than falling asleep in his bed that night, Mr. Sanchez then drafted a brief statement in which he confessed to breaking into the girl's house, but not to sexually assaulting her.  He dated the statement 2:13 p.m. on July 18, 2009.  Every fact in the statement had been told to him by one or more Defendants during his multiple interviews.  At least one fact in the statement---that the little girl had screamed---was actually inconsistent with the victim's own statements about the assault but had been suggested to Mr. Sanchez during the interviews.

61.     In the course of his employment with the Office of the District Attorney for the Eighteenth Judicial District (the "Office"), Investigator Dickson has received only minimal training as a polygraph examiner and has not received training on appropriate and non-coercive use of the polygraph during an interrogation, or on appropriate and non-coercive use of the polygraph to interview individuals with disabilities or low IQs. The Office knew that Investigator Dickson and other employees were authorized to conduct polygraph examinations and did in fact conduct such examinations, knew that these employees would use polygraph examinations as interrogation techniques, knew that these employees would use polygraph examinations when interviewing individuals with disabilities and low IQs, and knew that failing to train Investigator Dickson and other employees on the aforementioned topics gave rise to a risk of coerced confessions.

62.    Before Mr. Sanchez wrote and signed his statement, at 1:56 p.m., Detective Mykes received a page message informing her that his bond on the trespass charge had been paid by his father and "we have no reasons to hold him."  A second message added, "[Anthony] Sanchez needs an explanation.  This needs to happen now."  Detective Mykes received the page messages, but ignored them, and did not stop the questioning of Mr. Sanchez, contact Mr. Sanchez's father, or inform Mr. Sanchez that he was free to leave.  Detective Mykes learned of the bond payment even before she received the page messages.

63.    After Mr. Sanchez completed his written statement, Investigator Dickson asked him a series of follow-up questions about it.  Mr. Sanchez was unable to answer the most basic questions regarding his alleged role in the offense.

64.    For example, in response to Dickson's questions, Mr. Sanchez could not explain how he allegedly reached the screened second-story window of the young girl's bedroom.  Investigator Dickson suggested a ladder, and Mr. Sanchez then agreed, "I used the ladder to get on the roof."  This statement could not have been correct, because no ladder was found at the scene---as Mykes, Duffy and Dickson knew.  Mr. Sanchez also could not explain how he opened the window, whether the window had a screen, where the window was located on the house, or how he got down from the roof.

65.    Mr. Sanchez was then verbally advised of his Miranda rights in relation to the charge of sexual assault on a child by Detective Duffy, who told him only that he was being held on a "new charge" with no explanation of the nature or gravity of that charge.  Only at this point, when Mr. Sanchez asked, "Did my parents call?," was he informed that his parents had paid his bond on the prior charges.

66.     Detectives Mykes and Duffy proceeded to reinterview Mr. Sanchez, in another attempt to fill in the many missing details in his statement.  Mr. Sanchez was utterly unable to provide any additional information about the alleged sexual assault beyond what the officers had told him.  He continued to show great difficulty in answering questions and to provide many nonverbal answers and physical indications of confusion and distress, and asked repeatedly for his parents.

67.     Based on Mr. Sanchez's affect, difficulty in understanding questions, difficulty answering questions, general demeanor, and known seizure disorder, Detectives Duffy and Mykes and Investigator Dickson knew that Mr. Sanchez suffered from some type of mental impairment and limited intelligence.  They knew that Mr. Sanchez was not capable of providing accurate information in response to their questions and that Mr. Sanchez was susceptible to pressure to agree with statements they made to him.  As a result, they knew that Mr. Sanchez's testimony during their interview and all prior interviews, and his written statement to Investigator Dickson, were not knowing or voluntary and had been coerced.  Detective Mykes wrote in her notes regarding the interview that she questioned Mr. Sanchez's "cognitive abilities."

68.     At roughly 3:00 p.m. on July 18, 2009, Detective Mykes finally informed Anthony Sanchez that his son was detained on a new charge of sexual assault on a child and had written a confession.   Anthony Sanchez immediately told Mykes that his son did not have the capacity to make the decisions required to confess to a crime, and added that this should have been obvious to anyone who spoke to him for more than a few minutes.  Detective Mykes acknowledged to Anthony Sanchez that she had noticed

Mr. Sanchez's disabilities, but said that they were irrelevant because he was an adult. Mykes then returned to continue her interrogation of Mr. Sanchez.

69.     Anthony Sanchez then called the Douglas County Public Defender's Office, and Public Defender Tom Ward arrived and ended the interrogation at about 3:20 p.m.  At that point, Mr. Sanchez had been in custody for approximately 38 hours and had been actively interviewed for roughly 15 hours.

70.     In the course of her employment with the Douglas County Sheriff's Office, Detective Heather Mykes has received training on interrogation techniques, but she has not been trained regarding how to properly apply those techniques to suspects who may be vulnerable to coercion due to disabilities or low IQ.  The Douglas County Sheriff's Office and Board of County Commissioners knew that Detectives working for the Sheriff's Office would interrogate suspects with disabilities and low IQs during the course of their employment, and knew that failing to specially train them on conducting such interrogations gave rise to a risk of coerced confessions.

71.     On July 18, 2009, Detective Mykes drafted and signed a Statement in Support of Warrantless Arrest of Mr. Sanchez on three felony charges related to the sexual assault.  She did not report Mr. Sanchez's known seizure disorder, communication difficulties, or cognitive limitations in the statement.  Detective Duffy and Investigator Dickson assisted with the drafting of the Statement in Support of Warrantless Arrest.  That same day, Detective Mykes described Mr. Sanchez's false written and verbal confessions by phone to a judge, who authorized a $1,000,000 bond. Mykes did not report Mr. Sanchez's known seizure disorder, communication difficulties, or cognitive limitations, or the resulting unreliability of his confessions, to the judge.

72.     On July 19, 2009, Defendant Duffy interviewed Mr. Sanchez's father, Anthony Sanchez.  Anthony Sanchez described his son's disabilities in detail to Duffy, explaining among other things that he cannot speak or communicate well, has seizures, is unusually compliant with others' demands, attended Special Education classes throughout school, and did not speak his first word until he was 5 years old.  During the interview, Duffy requested that Anthony Sanchez sign an authorization to obtain Mr. Sanchez's school records.  Duffy briefed Detectives Mykes, Hartley and Wolff on this interview.

73.     On July 20, 2009, in reliance upon Hartley and Wolff's statements and omissions about their interviews with Mr. Sanchez, the District Attorney filed the Misdemeanor Summons and Complaint drafted by Detective Cirbo for the Branham Drive trespass.  Hartley and Wolff did not report Mr. Sanchez's known seizure disorder, communication difficulties, or cognitive limitations, or the resulting unreliability of his confessions, to the District Attorney.  The District Attorney did not review the videotaped interviews of Mr. Sanchez by Detectives Mykes and Duffy and Investigator Dickson or transcripts thereof before filing the Summons and Complaint.

74.     On the same date, a magistrate judge signed a determination finding probable cause to detain Mr. Sanchez for committing the Branham Drive trespass, based on Detective Cirbo's Statement in Support of Warrantless Arrest.  The magistrate kept Mr. Sanchez's bond at $1,000,000 for the pending sexual assault charges, and noted that the bond was set at $1,000,000 rather than $100,000 because Mr. Sanchez was alleged to have committed the Branham Drive trespass just a week after allegedly committing the sexual assault.  In making these determinations, the magistrate

reviewed and relied upon Detective Mykes' Statement in Support of Warrantless Arrest for the sexual assault.

75.     On July 22, 2009, Detective Mykes drafted and signed an Affidavit in support of a warrant for Mr. Sanchez's arrest on the three felony charges arising from the sexual assault.  Again, she did not report Mr. Sanchez's known seizure disorder, language difficulties, and cognitive limitations, or the resultant unreliability of his confessions, in the Affidavit.  Under "Known Medical Problems" on the accompanying Information Slip, Mykes wrote, "Not Noted."  Detective Duffy and Investigator Dickson assisted with the drafting of this Affidavit.

76.     Relying upon the information in Mykes' Affidavit and earlier Statement in Support of Warrantless Arrest, as well as information verbally communicated by Detectives Mykes and Duffy and Investigator Dickson, the District Attorney filed a Felony Complaint and Information on the three charges arising from the sexual assault on July 22, 2009.  Both Mykes' Affidavit, and her earlier Statement in Support of Warrantless Arrest, were filed with the Court.  The District Attorney did not review the videotaped interviews of Mr. Sanchez by Detectives Mykes and Duffy and Investigator Dickson or transcripts thereof before filing the Complaint.  Mykes, Duffy and Dickson intentionally omitted information about Mr. Sanchez's obvious disabilities and known seizure disorder, and the resultant unreliability of his confessions, when drafting the Affidavit and communicating with the District Attorney.

77.     On July 23, 2009, Mr. Sanchez appeared before a judge for the filing of charges arising from the sexual assault.  The judge reviewed Mykes' Statement in Support of Warrantless Arrest and Affidavit.  The judge denied a bond reduction, again

based in part upon the allegation that Mr. Sanchez had also committed the Branham Drive trespass.  A bond reduction was also denied on July 31, 2009, after the judge's review of Mykes' Statement and Affidavit and based in part upon the Branham Drive trespass allegation.

78.     On August 4, 2009, despite knowing that Mr. Sanchez was represented by counsel and did not have the mental capacity to knowingly and voluntarily respond to questioning, Detective Wolff and another officer visited Mr. Sanchez at the Jail and attempted to reinterview him yet again.

79.     As the case progressed, Defendants continually learned new information regarding Mr. Sanchez's disabilities and the reasons for his obvious limitations during their interviews.  For example, on August 5, 2009, Defendants Mykes and Duffy received the results of the drug and alcohol testing performed on Mr. Sanchez's urine sample.  The sample was negative for any drugs and alcohol, eliminating those as potential causes for Mr. Sanchez's obvious impairment on July 17 and 18, 2009.   The Detectives also interviewed numerous witnesses who described Mr. Sanchez's disabilities to them, including his girlfriend and coworkers.

80.     On January 6, 2010, Detective Mykes drafted and signed an Affidavit for Arrest Warrant on a new felony charge arising from the Branham Drive trespass, in addition to the previously-filed misdemeanor charge.  Once again, Mykes did not include any mention of report Mr. Sanchez's known seizure disorder, communication difficulties, or cognitive limitations in the Affidavit.  Detectives Hartley, Wolff and Duffy and Investigator Dickson assisted with the drafting of this Affidavit.  The District Attorney

filed the Affidavit in Douglas County County Court on January 6, 2010 and filed a Felony

Complaint and Information on this additional charge on January 7, 2010.

81.     On March 30, 2010, the Douglas County County Court began a

preliminary hearing regarding the felony allegations against Mr. Sanchez.  The hearing

continued on April 27 and 28, 2010.  At the hearing, Detectives Wolff and Mykes

testified in support of the charges against Mr. Sanchez.  Each testified regarding the

statements made by Mr. Sanchez and suggested that his statements were given in a

knowing and voluntary manner and were not coerced.  At the time of their testimony,

Detectives Wolff and Mykes knew that Mr. Sanchez's statements were not knowing or

voluntary and had been coerced.

82.      Detective Wolff falsely claimed during the hearing that he saw no

indications that Mr. Sanchez was suffering from any mental health issue, that Mr.

Sanchez never told him he was suffering from sleep deprivation, that Mr. Sanchez

never gave any indication that he didn't understand anything the Detectives asked him,

that Mr. Sanchez frequently gave narrative responses to the Detectives' questions, and

that it was not possible that Mr. Sanchez's eventual confession was false.

83.     Detective Mykes falsely claimed that she had no indication that Mr.

Sanchez was mentally compromised or had a developmental disability, and that it was

not possible that Mr. Sanchez's confession was false.

84.     Based on the false inculpatory statements made by Mr. Sanchez to the

Defendants and their testimony regarding those statements, the Court found that there

was probable cause to pursue all four felony charges against Mr. Sanchez.

85.     On March 9, 2012, the Douglas County District Attorney's Office received the results of an independent medical examination of Mr. Sanchez by the Colorado Mental Health Institute at Pueblo ("CMHIP").  Among other things, the CMHIP Report concluded that the inculpatory statements made by Mr. Sanchez were not made in a knowing and voluntary fashion, but were rather the result of suggestions made by the Defendants, and that Mr. Sanchez's disabilities combined with the Defendants treatment of him provided a reasonable basis to believe that his confessions were false.

86.     In two motions filed on April 4, 2012 and April 12, 2012, based upon the CMHIP independent medical examination, the Douglas County District Attorney's office dismissed all charges against Mr. Sanchez.  The dismissals were not based upon any agreement of compromise with Mr. Sanchez, but only upon the likely falsity of his confessions and the prosecution's resultant inability to meet its burden of proof.  The District Attorney's motions explained that "based on [Mr. Sanchez]'s intellectual disabilities, cognitive functioning impairments, and speech and language disabilities," his statements could not be relied upon as evidence and "the People are left with insufficient evidence" to prove the charges against him.

87.     As a result of false charges leveled against Mr. Sanchez, he spent four months (125 days) in detention in the Douglas County Jail, much of it in solitary confinement due to his inability to protect himself from other inmates because of his disabilities.  He then spent over five months (159 days) subject to restrictions on his geographic location that prevented him from living in his own home with his parents or from entering a large part of Douglas County, required him to live with relatives in Englewood, and required GPS monitoring.  Finally, beginning at the end of the

preliminary hearing, he spent nearly two years (715 days) subject to restrictions on his geographic location that allowed him to return to live at his family home but still restricted his movements and required GPS monitoring.   During this time, Mr. Sanchez was prohibited from entering most of the town of Parker, Colorado, an area which included many of the places to which he frequently travelled prior to his arrest, including, for example, his grandparents' homes.  This restriction made it difficult for Mr. Sanchez to travel to job sites where he worked for his father's company.  From the time of his release from jail, Mr. Sanchez was also prohibited from being near children under age 18, which restrained his freedom of movement significantly and meant he could not enter or travel to many public places which he frequented before his arrest.  These restrictions constituted non-standard conditions of pretrial release.  Each of these restrictions constituted a seizure and a violation of Mr. Sanchez's liberty interests.

88.     As a result of the false charges brought against him, Mr. Sanchez suffered extreme emotional distress, including depression, anxiety, humiliation, extreme feelings of guilt, and exacerbation of his preexisting disorders.

89.     As a result of the false charges brought against him, Mr. Sanchez suffered damage to his reputation, lost wages, and was required to expend substantial amounts of money on attorneys' fees and costs and the costs of GPS monitoring, among other costs.

90.     In this case, Defendants' misconduct was willful and wanton and taken with reckless disregard for Mr. Sanchez's rights and feelings.

91.     In this case, Defendants' actions violated clearly-established law of which a reasonable person in their position would have known.

## V.  CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Malicious Prosecution in Violation of the Fourth Amendment and Fourteenth Amendment Procedural Due Process under 42 U.S.C. § 1983**
**(Against All Defendants)**

92.    Plaintiff Sanchez incorporates Paragraphs 1 through 91 as if fully restated herein.

93.    Defendants caused Plaintiff Sanchez's continued confinement and prosecution after the institution of legal process.   Among other things, Defendants did so by knowingly coercing Plaintiff Sanchez's false inculpatory statements; by arresting Mr. Sanchez based solely upon these statement; by pursuing the filing of charges based solely upon these statements; by omitting exculpatory information and falsely asserting that Mr. Sanchez's statements were true, reliable, and not coerced when informing the District Attorney of Mr. Sanchez's statements; by omitting exculpatory information and falsely asserting that Mr. Sanchez's statements were true, reliable and not coerced when communicating with magistrates who set bail and determined probable cause; by omitting exculpatory information and falsely asserting that Mr. Sanchez's statements were true, reliable and not coerced in written Statements in Support of Warrantless Arrest and Affidavits in Support of Arrest; and by omitting exculpatory information and falsely testifying during the March 30, 2010 and April 27 to 28, 2010 preliminary hearing on probable cause that the statements were true, reliable, and not coerced.

94.    The legal process instituted by Defendants was terminated in favor of Plaintiff Sanchez when the prosecution dismissed the charges against him due to lack of evidence in April 2012.

95.     No probable cause supported Plaintiff Sanchez's continued confinement and prosecution at the time of institution of legal process against him.  Mr. Sanchez's statements lacked sufficient reliability to provide probable cause and Defendants knew this from the time they were made.

96.     Defendants acted with malice.

97.     As a result of Defendants' conduct, Plaintiff Sanchez suffered damages.

98.     Defendants Board of County Commissioners and Douglas County Sheriff's Office failed to properly train and supervise their employees to avoid the use of coercive interrogation tactics on vulnerable suspects and the pursuit of prosecution based on coerced statements.

99.     Defendants Board of County Commissioners and Douglas County Sheriff's Office knew, or should have known, that their employees would use coercive interrogation tactics on vulnerable suspects and pursue prosecution based on coerced statements.  Defendants Board of County Commissioners and Douglas County Sheriff's Office were deliberately indifferent to the constitutional rights of citizens, knowing that dangerous consequences could be suffered by citizens such as Plaintiff Sanchez by failing to properly train their employees in this regard.

100.    The policy, custom, and practice of Defendants Board of County Commissioners and Douglas County Sheriff's Office in failing to properly train their employees was the moving force and proximate cause of the violation of Plaintiff Sanchez's constitutional rights and caused Plaintiff Sanchez's damages.

101.    Defendant Office of the District Attorney for the Eighteenth Judicial District failed to properly train and supervise its employees to avoid either the use of improper

polygraph examinations and coercive use of polygraph examinations during interrogations of vulnerable suspects, or the pursuit of prosecution based on coerced statements.

102.    Defendant Office of the District Attorney for the Eighteenth Judicial District knew, or should have known, that its employees would conduct improper polygraph examinations and use of polygraph examinations coercively during interrogations of vulnerable suspects, and would pursue prosecution based on coerced statements. Defendant Office of the District Attorney for the Eighteenth Judicial District was deliberately indifferent to the constitutional rights of citizens, knowing that dangerous consequences could be suffered by citizens such as Plaintiff Sanchez by failing to properly train its employees in this regard.

103.    The policy, custom, and practice of Defendant Office of the District Attorney for the Eighteenth Judicial District in failing to properly train its employees was the moving force and proximate cause of the violation of Plaintiff Sanchez's constitutional rights and caused Plaintiff Sanchez's damages.

WHEREFORE, Plaintiff Sanchez respectfully requests that this Court enter judgment in his favor and against the Defendants, and grant:

(a)    Appropriate declaratory and other injunctive and/or equitable relief;

(b)    Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c)    All economic losses on all claims allowed by law;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)     Attorney fees and the costs associated with this action, including those associated with having to defend against the false criminal charge as well as expert witness fees, on all claims allowed by law;

(f)     Pre- and post-judgment interest at the lawful rate; and

(g)     Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 31st day of October, 2013.

**BENEZRA & CULVER, P.C.**

**s/ Sarah J. Parady**

_____

John A. Culver, Esq.
Seth J. Benezra, Esq.
Sarah J. Parady, Esq.
274 Union Blvd., #220
Lakewood, CO  80228-1835
(303) 716-0254
(303) 716-0327 fax
jaculver@bc-law.com
sjbenezra@bc-law.com
sjparady@bc-law.com

Plaintiff's Address

3233 E. Birch Avenue
Parker, CO  80134