**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 13-cv-1945-WJM-CBS

TYLER SANCHEZ,

      Plaintiff,

v.

JOE RYAN HARTLEY, Detective, in his individual capacity,
RYAN WOLFF, Detective, in his individual capacity,
MIKE DUFFY, Detective, in his individual capacity,
HEATHER MYKES, Detective in her individual capacity,
MICHAEL DICKSON, Investigator, in his individual capacity,
BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY, and
DOUGLAS COUNTY SHERIFF'S OFFICE,

      Defendants.

---

## ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

In this action, Plaintiff Tyler Sanchez ("Sanchez") alleges that the various Defendants knowingly or recklessly extracted from him a false confession to a sexual assault for which he was unsuccessfully prosecuted, and that Defendants are therefore liable to him under 42 U.S.C. § 1983 for malicious prosecution in violation of the Fourth Amendment. Currently before the Court are three summary judgment motions filed by various groups of parties, as follows: (1) a motion filed by Defendants Joe Ryan Hartley ("Hartley") and Ryan Wolff ("Wolff") (ECF No. 184); (2) a motion filed by Defendants Heather Mykes ("Mykes"), Mike Duffy ("Duffy"), the Board of County Commissioners of Douglas County, and the Douglas County Sheriff's Office (ECF No. 180); and (3) a motion filed by Defendant Michael Dickson ("Dickson") (ECF No. 175). Throughout this

order the Court will refer to the individual Defendants (*i.e.*, all Defendants except the Board of County Commissioners of Douglas County and the Douglas County Sheriff's Office) collectively as "Defendants," unless the context requires otherwise.

For the reasons explained below, Defendants' motions are denied, and this case will be set for trial to resolve significant factual disputes that prevent the Court from applying qualified immunity. Sanchez's counsel are also cautioned regarding certain exaggerated characterizations of the summary judgment record.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless attributed to a party, or otherwise noted.

### A. The Crimes in Question

#### 1. The Quarry Hill Sexual Assault

In the early morning of July 10, 2009, a mother residing on Quarry Hill Drive in the Stonegate neighborhood of Parker, Colorado, made a 911 call to the Douglas County Sheriff's Office ("DCSO"), reporting that someone had broken into her home through her eight-year-old daughter's second story window and had sexually assaulted the daughter. (ECF No. 180 at 4, ¶ 1; ECF No. 204 at 4 ¶ 8.)[1] DCSO began to investigate, including through interviewing the family and the child, interviewing neighbors, and gathering fingerprints and DNA. (ECF No. 180 at 4, ¶ 2.) The young victim of the sexual assault told investigators that the perpetrator was a white man who appeared to be about her father's age (her father was 40 years old) and about the same size and build as her father (her father weighed slightly less than 200 pounds), with brown hair parted in the middle and no tattoos on his hands or arms. (ECF No. 204 at 4, ¶ 9.)

#### 2. The Branham Drive Trespass

On July 17, 2009 (one week later) at approximately 12:40 AM, Defendants Wolff and Hartley (both Parker police officers) and DCSO Deputy Jason Cirbo (not a party here), responded to a call regarding a prowler on Branham Drive in the Stonegate neighborhood. (*Id.* at 5, ¶ 11.) Wolff, Hartley, and Cirbo learned that the caller (a

---

[1] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination.

homeowner in the neighborhood) had noticed a man wearing black clothing and a dark baseball cap in his backyard.  (*Id.*; ECF No. 180 at 5, ¶ 5.)  When the prowler spotted the homeowner through a window, he fled, knocking over patio furniture and jumping the back fence.  (*Id.*)

Shortly thereafter, a Parker police officer (not a party here) observed a car at the intersection of Lincoln Avenue and Chambers Road in Parker.  (ECF No. 204 at 5, ¶ 12; ECF No. 205-2 at 90.)  By the shortest driving route, that intersection is just over 1 mile from the Branham Drive address where the prowler had been reported.[2]  This intersection can see high traffic during the daytime, but is not busy in the middle of the night.  (ECF No. 184 at 3, ¶ 6.)

The reporting officer further noticed that the occupant of the car was a white male wearing a black shirt.  (*Id.*)  The reporting officer relayed the car's license plate number, which Wolff entered into his computer and traced to an address on Birch Avenue in Parker (which, as they would soon learn, was the address of Sanchez and his family).  (ECF No. 184 at 3, ¶ 7.)  Wolff, Hartley, and others not parties here, drove to the Birch Avenue address and found Sanchez sitting in his car—the same car spotted at Lincoln and Chambers—in the driveway.  (*Id.* ¶ 7.)

---

[2] Sanchez's counsel attempts to make this distance into a significant dispute because at the preliminary hearing described later (Part II.E.2), Wolff estimated that the intersection of Lincoln and Chambers was a "[m]ile and a half, two miles maybe" from the Branham Drive address (ECF No. 205-2 at 90), whereas at his deposition in this case Wolff supposedly "lied and stated that [the car in question] was seen less than three-quarters of a mile from Branham [Drive]" (ECF No. 204 at 5, ¶ 12).  In reality, the deposition testimony at issue shows that Sanchez's attorney asked Wolff to estimate "[h]ow far west" Chambers Road is from Branham Drive, and in response to that question, Wolff answered "[m]aybe three-quarters of a mile." (ECF No. 204-14 at 15.)  The question, in other words, had nothing to do with the distance between Branham Drive and the intersection of Chambers and Lincoln.  Regardless, using Google Maps, the Court itself has calculated the distance from the Branham Drive address to the intersection of Lincoln and Chambers, and now judicially notices that the distance is about 1.1 miles.

**B.    Tyler Sanchez**

As will become clear shortly, Wolff's and Hartley's encounter with Sanchez in his driveway would lead to multiple interrogations over the course of the next few days regarding a number of different crimes.  But, how to view the evidence generated over that time span turns heavily on what Wolff, Hartley, and the other Defendants allegedly must have noticed regarding Sanchez's physical appearance and mental functioning.  The Court will therefore address that matter before resuming the narrative.

At the time Wolff and Hartley first approached him, Sanchez was just a few days shy of his nineteenth birthday.  (ECF No. 204 at 2, ¶ 1.)  He is a high school graduate.  (ECF No. 180 at 10–11, ¶ 27.)  He has red hair, and wore it in a buzz cut as of July 2009.  (ECF No. 204 at 4–5, ¶ 10.)  Also as of July 2009, he had a very thin build and weighed approximately 130 pounds.  (*Id.*)  He has easily visible tattoos on each forearm, one reading "Sanchez" and the other reading "Michelle" (the name of his girlfriend at the time).  (*Id.*)

Sanchez claims that he is—and, as of July 2009, was—cognitively and developmentally disabled.  (*Id.* at 2, ¶ 2.)  In support, he cites from the report of a psychiatrist, Ashley Wheeler, M.D., who evaluated him in March 2012 (a circumstance the Court will describe below in Part II.E.3.c).  (*Id.* ¶¶ 2–4.)  Dr. Wheeler opined that, in July 2009, Sanchez suffered from "mixed receptive-expressive language disorder, borderline intellectual functioning, auditory processing deficits, social anxiety, and submissive personality traits."  (ECF No. 204-1 at 109.)  He has, according to Dr. Wheeler, "problems comprehending vocabulary, grammar, and understanding abstract concepts."  (*Id.* at 95.)  These problems can be exacerbated by anxiety and fatigue.  (*Id.* at 96.)

Most important for present purposes, Sanchez asserts that his "disabilities are open and obvious." (ECF No. 204 at 3, ¶ 5.) In particular, he claims that he

> presents as a significantly younger person than his actual age. His inability to understand questions and provide appropriate responsive information, as well as his reduced intellectual functioning, are obvious to anyone who speaks with him. It is obvious that he is susceptible to suggestions made by authority figures.

(*Id.* (citations omitted).) In support of these assertions, he cites the deposition testimony of his parents and a criminal defense lawyer who later represented him. These witnesses claim that Sanchez does not openly communicate, has limited conversation ability, requires questions to be simplified, and that all of this is open and obvious— although, partly to the contrary, his criminal defense attorney acknowledged that Sanchez "masks it well" because "he doesn't talk about the fact that he's got a disability. He doesn't explain to you that he doesn't understand you. * * * He'll agree with anything you say." (ECF No. 204-5 at 15.)

The Court will frequently return to Sanchez's disability, and its allegedly open and obvious nature, in the Analysis section (Part III). For present purposes, it is enough to keep the allegation in mind as it relates to the events described below.

**C.     The Various Interviews and Interrogations**

1.     <u>Wolff's and Hartley's Interaction with Sanchez in His Driveway</u>

When Wolff and Hartley approached Sanchez sitting in his car, they noticed that he "appeared very nervous and was sweating." (ECF No. 204 at 7, ¶ 16.) He was also wearing black pants and a black McDonald's shirt. (ECF No. 205-8 at 3.) Wolff and Hartley then began interviewing Sanchez and reportedly learned that he had just worked the late shift at McDonald's. (*Id.*) When inquiring about whether Sanchez had

stopped anywhere on his way home from McDonalds, the officers—according to Sanchez—"repeatedly suggested to Mr. Sanchez specific details about the Branham Drive trespass," after which Sanchez "allegedly admitted to [that] trespass by going along with Defendants' suggestions." (ECF No. 204 at 7, ¶ 18.) Sanchez does not concede that he actually admitted the trespass, and in fact accuses Wolff and Hartley of fabricating most of the details of this interview, which was not video- or audio-recorded. (ECF No. 200 at 2, ¶ 6.)

In the middle of this interview, Sanchez's mother, Cynthia, exited the home. (ECF No. 204 at 7, ¶ 19.) According to her deposition testimony, one of the police officers (she does not remember which one) told her that she could not approach Sanchez and so, she says, "I yelled out, I told him, He doesn't understand all of this, you know. And they wouldn't let me—they just—I had to yell something out like that." (ECF No. 204-3 at 18.)[3]

Based on what Wolff and Hartley claim to be Sanchez's responses to their questions, Sanchez was arrested for criminal trespass, and transported to the Douglas County Jail. (ECF No. 204 at 8, ¶ 21.)

2. Sanchez's Interview with Wolff and Hartley at the Jail

Beginning at about 2:20 AM on July 17, 2009, Wolff and Hartley interviewed Sanchez for about two hours in what was known as the "DUI room" of the Douglas County Jail. (*Id.* ¶ 23.)[4] The DUI room has video surveillance cameras, without audio,

---

[3] Sanchez's attorneys significantly exaggerate the evidentiary value of this statement, citing it as support for the much bolder proposition that Cynthia Sanchez specifically "told Defendants Wolff and Hartley that Mr. Sanchez was disabled and could not understand their questions." (ECF No. 204 at 8, ¶ 19.)

[4] Wolff and Hartley allege that "the exact length of such interview is not known and [they]

but the Douglas County Jail preserves surveillance video for only thirty days, and the video of this interview was not preserved before being overwritten in the normal course. (*Id.* at 12, ¶ 35; ECF No. 210 at 6, ¶ 35; ECF No. 214 at 10, ¶ 35.) Sanchez attempts to pin blame for this on Wolff and Hartley, alleging that they "permitted the tape to be destroyed." (ECF No. 204 at 12, ¶ 35.) Sanchez's cited evidence does not actually support this claim (*see id.*), but Wolff and Hartley cite no evidence that they could not have ensured preservation of the video. At his deposition, Wolff stated that, at the time, he "was not actively thinking that [the interview] was being recorded" and therefore took no action to preserve the surveillance video. (ECF No. 204-14 at 41.)

Regardless, the parties agree that Wolff and Hartley not only asked about the Branham Drive trespass, but also about the Quarry Hill sexual assault a week earlier (which occurred in the same general neighborhood) and various other burglaries and trespasses then being investigated by DCSO. (ECF No. 204 at 8–10, ¶¶ 24, 29.) Wolff and Hartley mostly asked yes or no questions, including frequent questions where Sanchez was asked whether he remembered various details of the crimes in question, such as whether he remembered being in a backyard in the Stonegate neighborhood, or fleeing through a second-story window at the Quarry Hill address. (*Id.* at 9, ¶ 27.)[5]

All of the facts that Sanchez eventually confirmed were facts that Wolff and Hartley had supplied to him. (*Id.*) Moreover, although they had no DNA evidence, Wolff and Hartley coyly asked Sanchez "if there would be any reason that his DNA would be

---

ha[ve] different estimates for such length" (ECF No. 214 at 8, ¶ 23), but they do not provide their own estimates, and, more importantly, they fail to cite supporting evidence. The Court therefore treats the two-hour length as undisputed for summary judgment purposes.

[5] Sanchez's cited evidence does not support his claim that Wolff and Hartley asked "*exclusively* 'yes or no' questions." (*Id.* (emphasis added).)

located on a tree and screen [at the Quarry Hill address] and [Sanchez] stated yes because he climbed a tree [and removed a screen to get into the house]." (ECF No. 205-10 at 4.)[6]  And, concerning the Branham Drive trespass, Sanchez agreed with a suggestion from Wolff and Hartley that he fled the backyard when the back porch light came on, although the homeowner had never reported to police that he had turned on a porch light.  (ECF No. 204 at 9, ¶ 27.)  By the end of the interrogation, Sanchez had confessed to the Branham Drive trespass, and also to breaking into the Quarry Hill address on the morning of the sexual assault, although he denied sexually assaulting the girl.  (*Id.* at 9–11, ¶¶ 27–28, 32; ECF No. 184 at 5, ¶ 15.)  He also confessed to certain other burglaries and trespasses, including incidents where—as with Quarry Hill—Sanchez bore no obvious resemblance to the perpetrators as described by the various victims.  (ECF No. 204 at 10, ¶ 29.)

At 4:45 AM or thereabouts, Deputy Cirbo drafted and signed a Statement in Support of Warrantless Arrest and a Misdemeanor Summons and Complaint, both related to the Branham Drive trespass.  (*Id.* at 13, ¶ 37.)  Sanchez says that Deputy Cirbo "relied solely on Hartley and Wolff's representations" to draft these documents (*id.*), and Hartley and Wolff concede that Cirbo "relied, in large part, upon [them] for the information included therein" (ECF No. 214 at 11, ¶ 37).  Both documents generally repeated the statements Wolff and Hartley had coaxed out of Sanchez.  (*See* ECF Nos. 205-1, 205-8.)  They contain no mention of anything that might cast doubt on Sanchez's reliability, such as his demeanor, disabilities, suggestibility, allegedly suspected

---

[6] Sanchez's cited evidence does not support his claim that Wolff and Hartley "lied to [him,] telling him that his DNA *had been found* in locations which implicated him in the crimes." (ECF No. 204 at 11, ¶ 31 (emphasis added).)  Nonetheless, as will become clear below, Sanchez interpreted this kind of statement as a direct accusation.

intoxication, etc.  Sanchez claims that Wolff and Hartley intentionally omitted any such

details from the information conveyed to Cirbo.  (ECF No. 204 at 13, ¶ 37.)

The Statement in Support of Warrantless Arrest reports the evidence against

Sanchez (apart from his black clothing and alleged profuse sweating when first

approached in his driveway) as follows:

> Officers Hartley and Wolff spoke with Tyler Sanchez and
> were told by Tyler Sanchez that he had not been in the area
> [of the Branham Drive trespass] but had been on
> Cherrywood Drive visiting a friend but then changed his story
> and told them that he had in fact jumped the fence into the
> backyard at [the Branham Drive address] because he
> wanted to sit down but could not give a reason why he
> wanted, or needed, to sit down in that particular yard.  Tyler
> Sanchez had said that he had been on his way home from
> work at McDonald's.

(ECF No. 205-8 at 3 (capitalization normalized).)  As for the Quarry Hill sexual assault,

Hartley wrote a progress report in which he recounted Sanchez's alleged confession as

follows:

- He was asked if he remembered breaking into a house in
  Stonegate about a week and a half ago near the
  Stonegate pool.

- He stated that he remembered breaking into that house.

- He was asked how he got in and he stated that he did not
  remember.

- He was asked if he entered ground level or second level
  or if he had to climb up the house.

- He stated that he had to climb a little bit to get in but did
  not remember where he climbed up at.

- He was asked if after entering the house he went into a
  room that was occupied by a person.

- He stated that he remembered seeing someone while in
  the house and being startled and jumping out a window.

- When asked if the window was low or high he stated that the window was high.

- When asked who started [*sic*] him [and] he stated that he did not remember.

- He was asked specifically if it could have been a little girl and he stated that it could have been.

(ECF No. 205-10 at 4.)  Following this itemized list, the progress report continues as follows:

> Detective Wolff then questioned Tyler about his honesty in the crimes that he had confessed to during the interview. . . . Detective Wolff asked Tyler if he was only confessing to involvement in these crimes because he thought that it was what the Detectives wanted to hear or because he was actually involved.  Tyler stated it was because he remembered being involved in the incidents.  Detective Wolff then asked if he remembered being startled by a little girl in one of the burglaries in Stonegate and he again indicated that he did.  Detective Wolff asked specifically if he remembered fondling the little girl before he jumped out the window and ran away and Tyler stated he did not remember that.

(*Id.* at 4–5.)

3. <u>Sanchez's First Interview with Duffy and Mykes</u>

Defendants Mykes and Duffy (both DCSO detectives at the time) were the "co-lead" investigators on the Quarry Hill sexual assault case.  (ECF No. 204 at 14, ¶ 40.)  Not long after Wolff and Hartley finished interrogating Sanchez, they reported Sanchez's alleged confession regarding Quarry Hill to a DCSO officer, who relayed it to Mykes and Duffy.  (*Id.*)  Mykes and Duffy then went to the Douglas County Jail to interview Sanchez.  (ECF No. 204-8 at 18.)[7]

---

[7] Sanchez claims that "the Parker community was up in arms [about the Quarry Hill sexual assault] and Detectives Mykes and Duffy were under a significant amount of pressure to solve the case.  During her deposition, however, Detective Mykes lied and stated that she was

As of that date, both Mykes and Duffy had completed a forty-hour Crisis Intervention Team ("CIT") training course. (ECF No. 204 at 15, ¶ 43 (evidence cited); ECF No. 204-20 at 14 (Mykes completed CIT training in 2005, and Duffy did so in 2006).) DCSO's Rule 30(b)(6) deposition witness testified that CIT training is not aimed at teaching officers how to conduct criminal investigative interviews with potentially disabled persons, but is instead aimed at helping officers (among other things) to

> ask[] information-gathering questions to try to assess what's going on, what might be going on situationally in the person's life to have them in crisis, what else is going on in terms of drug use, alcohol use, medical issues, other mental health issues, those types of questions, to try to get an assessment of what's going on, what's driving the crisis, and what can we do to help resolve it.

(ECF No. 212-7 at 7–8.) In that context, officers going through CIT training are educated on how to recognize persons with cognitive disabilities, and are also informed that some of these persons are likely to respond to officers by telling them what they think the officers want to hear, meaning that leading questions should be avoided. (ECF No. 204 at 15, ¶ 43 (evidence cited).)

Previous to their interview with Sanchez, Mykes and Duffy reviewed Wolff's and Hartley's written progress reports regarding the interrogation earlier that morning, and they spoke with Wolff and Hartley, although the precise scope of the conversation is unclear. (ECF No. 204 at 14, ¶¶ 40–41.) As noted above, Duffy remembers Wolff and Hartley stating a general concern that Sanchez might be under the influence of alcohol

---

under no pressure to solve this case." (ECF No. 204 at 15–16, ¶ 46 (citations omitted).) The evidence Sanchez cites to support these assertions falls well short of actually doing so. Rather, this evidence shows that Mykes agreed that the case was "serious," that her office had sent out a public media release asking for help from the community, that Mykes's DCSO superiors considered the case a priority, and that those superiors put no unusual pressure on her to solve it. (*See id.* (evidence cited).)

or drugs.  (*Id.* ¶ 41.)  Just before the interview, however, and apparently in Mykes's presence, detention officers required Sanchez to take a breathalyzer test, which showed a breath alcohol level of zero.  (ECF No. 204-8 at 18.)

That interview itself began at about 7:35 AM in a dedicated interview room with an active audiovisual recording system.  (*See* ECF No. 180-1 (video recording of the interrogation); *see also* ECF No. 205-23 (transcript).)  Sanchez had by that time been awake since the previous morning with very little sleep.  (ECF No. 204 at 17, ¶ 50.) This fatigue is obvious in the video recording, as Sanchez yawns frequently, sometimes speaks with his eyes closed, and occasionally rests his head on his hands or on the table.  (*See generally* ECF No. 180-1; *see also* ECF No. 204 at 17, ¶ 54.)  Moreover, Sanchez frequently expressed to Mykes and Duffy how tired he was, and he informed them that he had slept for only about two hours over the last two days.  (*Id.*)  "Mykes and Duffy [additionally] observed that Sanchez was extremely anxious and his legs frequently shook."  (*Id.*)  Mykes and Duffy also recognized that Sanchez did not match the description of the Quarry Hill sex assault perpetrator.  (*Id.* at 17, ¶ 51.)

At the beginning of the interrogation, Sanchez timidly attempted to explain his alleged disability to the detectives through the following exchange between himself and Mykes:

> Q. Any alcohol on board?  Anything like that?  Drugs?
>
> A. No.  That's what they thought when I talked to them first but—
>
> Q. The reason I'm asking is you seem—
>
> A. 'Cause I usually get hesitated [*sic*] when I talk to these kind of people.
>
> Q. Any reason why?

> Q. When I talk to these kind of people like police officers and—
>
> A. Okay.
>
> Q. —all these.
>
> A. That I understand. When is the last time you had something to eat?

(ECF No. 205-23 at 9–10.) With Mykes's change of subject, Sanchez made no more effort to raise the topic. Soon after, however, Mykes asked him if he had "any kind of medical conditions that we need to be concerned about," to which Sanchez answered, "No." (*Id.* at 10.)

Sanchez also made an early effort to explain that he felt coerced by Wolff and Hartley to confess to crimes he did not commit. This came out when Duffy began questioning Sanchez about the route by which he drove home from McDonald's earlier that morning:

> Q. How come the different road today, or last night [*sic*], excuse me?
>
> A. I don't know. I decided it would be quicker.
>
> Q. Okay.
>
> A. Somehow, someone got my license plate then somehow I stopped [somewhere else on the way home from McDonald's], which I didn't. I know that for a fact.
>
> Q. Okay.
>
> A. I'm telling 100 percent honest truth right now.
>
> Q. Okay. Do you remember telling them you stopped?
>
> A. I didn't stop.
>
> Q. Okay. Do you remember telling the other detectives that?

A.      I had to tell them—

Q.      Because they were different—

A.      I had to—

Q.      Okay.  Go ahead.

A.      I had to tell them a different story because they were[n't] being—they were being like cooperative [*sic*] saying I was lying, saying the same story I said first to you.

Q.      Okay.

A.      Then saying—

Q.      What was the story you told them?

A.      The second—

Q.      The second time[.]

A.      That I stopped and all this, saying I went into somebody's backyard, which I didn't, and I trespassed, which I'm going to be charged.  And that's why I'm here, you know?

Q.      Okay.

A.      Which I didn't trespass.  And that's—

Q.      But did you tell them that you'd went in that backyard?

A.      Unfortunately I had to.  Now I can't do nothing about it.

Q.      Did you mention seeing anything when you were in that backyard[,] why you were there?  No?

A.      No.

Q.      You didn't tell them why you were there?

A.      I said something like I jumped the fence to—I don't— I don't remember.

Q.      Okay.

> A. And somehow, they got—somehow they got DNA fingerprints from—I don't know. It's just—I give up.
>
> Q. Okay. Let's get off last night a little bit, okay?

(*Id.* at 23–26.) Duffy then attempted to steer the interrogation toward his and Mykes's main interest, the Quarry Hill sexual assault:

> Q. You had talked a little bit about some other stuff that had been happening in this neighborhood and other neighborhoods. Do you remember that part of the conversation? That had been happening previous weeks, months? Can you tell me what you told them about those other incidents[,] about that?
>
> A. The—God, I'm too tired. Are you talking about breaking into houses and—
>
> Q. Uh huh.
>
> A. —which, telling me I broke into a house a week and a half ago, which I didn't. I mean, I don't—I can't even speak right now.
>
> Q. How come?
>
> A. I'm just so tired.

(*Id.* at 26–27.)

From there, Mykes and Duffy returned to seeking details about the Branham Drive trespass, and also asked about any other similar crimes (without suggesting details), which elicited a confession from Sanchez to some petty thefts from cars, to breaking and entering on occasion with a friend named Brian, to an apparent incident of joyriding with the same friend (discussed in the interview as "carjacking"), and to an underage drinking misdemeanor already on his criminal record from a few months earlier. (*Id.* at 27–53.) When pressed for details about breaking and entering, however, Sanchez generally had no memory, prompting the following exchange between him and Duffy:

Q. Tyler, one of the things that's really obvious here today is if it's something you know we already know about, like your previous arrest, or just general subject, man, you can just sit there and rattle off and talk to us like nothing—like nothing else.

A. I know, but I'm tired.

Q. But when we talk to you about what we're really here about, then you're tired.

A. I know—I was—

Q. It's time to start talking partner, okay?

A. I was saying—

Q. Do you need—do we want to take a quick break and take a deep breath and sip your Coke for a minute and come back and we'll start fresh and we'll really get into this? Does that sound like a good idea to you? Kind of give you a minute to collect your thoughts and we'll just start—we'll just let you sit there and tell us the story, okay?

All right. Just take a minute. We'll step out for just a minute. We'll give you a minute, okay?

A. This still happened the last time [with] the other two detectives.

Q. Well, I'm not going to be—you know, obviously we're not yelling at you. We're not threatening you, but it is—I'm telling you right now, from our observations and we're both seeing it, that when you want to talk to us, you can and you're not tired and you're able to just tell us the story and this, that and the other, okay?

(*Id.* at 54–55.)

The interrogation then ceased for a few minutes. After the break, Mykes and Duffy continued to try and elicit details about the times that Sanchez and "Brian" had allegedly broken and entered into others' houses, prompting Sanchez to state that he and Brian had done so on perhaps five occasions and had stolen things like jewelry and

prescription drugs.  (*Id.* at 59–71.)  Mykes and Duffy then transitioned to (in Mykes's

words) "the one that I really want to talk about . . . .  Tell me about last Friday [alluding

to the Quarry Hill sexual assault]."  (*Id.* at 73.)  Sanchez denied "get[ting] into a house

that wasn't [his]" on the previous Friday.  (*Id.* at 74.)  That led to the following:[8]

> Q [M]. . . . Is there reason that we might have your DNA in a house on Friday?
>
> A.     A house where?
>
> Q [M]. In the Stonegate area?
>
> A.     Why this?
>
> Q [D]. It's a simple question, Tyler.  Is your DNA going to be in a house in Stonegate on Friday?
>
> A.     You mean, it was Friday night?
>
> Q [M]. Friday morning.  Thursday night to Friday morning. Sun goes down on Thursday.  Comes back up Friday. In between those two times.  Here's the thing, Tyler, okay?
>
> A.     I'm—
>
> Q [M]. Again, I'm really trying to be—
>
> A.     I know.
>
> Q [M]. —up front with ya.  There was a burglary in Stonegate Friday morning, and I think it was you.  I would like for you to try and prove me wrong.  I would like you tell me why you were—why I would find DNA from you in that house.  Explain to me why I'm going to find that there, because I believe I will and we've already sent some to the lab.  Now we're getting it screened and when it comes back and it shows that it's yours, I'll want to know why it was there.
>
> A.     I wasn't—

---

[8] In this and subsequent excerpts, "[M]" and "[D]" denote Mykes and Duffy, respectively.

Q [M]. I want to know why.

A.    —in Stonegate.

Q [M]. You weren't in Stonegate?

A.    I wasn't in Stonegate[.]

Q [M]. Then where were you?

A.    I don't know why my DNA is there.

(*Id.* at 75–77.)

Mykes and Duffy then told Sanchez that they would talk to his friend Brian who would "sell you out." (*Id.* at 78.)

Q [D]. He's going to sit there and tell us everything he knows about you. And we can't get anything—you didn't— you can't even remember where you were or what you did on [*sic*] a week ago.

A.    Well, I know I didn't break into a house a week ago. I know that for a fact.

Q [D]. You've already told detectives you did. You've already said you did, so now you're saying you didn't.

Q [M]. Tyler, I'm out of—

A.    I don't know—I don't know why my DNA is showing up.

Q [M]. I really, really want to believe you, but I'm having a hard time. Every time we talk about a topic that might be a little bit difficult for you, you're putting your head down, you're rubbing your eyes. You're saying you[']r[e] tired.

I ask you an inane question like when did you get your haircut. You said a month ago, pretty quick. You smiled. Your head came up. You were bright and shiny, wide awake. I ask you about a week ago and you don't know where you were.

Do you see the problem I'm having? . . .

(*Id.* at 78–79.)  Not long after, Mykes simply declared, "Fact of the matter, Tyler, is that we're not here to talk to you to see who did it.  We know who did it.  I want to know why, maybe exactly how."  (*Id.* at 81.)  Mykes and Duffy repeated that sentiment in various different ways, apparently prompting Sanchez to begin thinking about the Branham Drive trespass again.  Sanchez volunteered that his relationship with his girlfriend had recently been causing a lot of stress and so he had decided to go to "some random person's house and jump[] the fence, then just—I just find something."  (*Id.* at 84.)

> Q [M].  You were going to find something.  What?
>
> A.      Like just find something to do and—sat there.
>
> Q [M].  So what were you going to do back there?
>
> A.      I don't know.  I was thinking about it at first that I was still going to—that I was still doing it.  Then all of a sudden, a person—all of a sudden I saw a person, then I jumped back over the fence.
>
> Q [M].  You said you were thinking about doing it.  You were thinking about getting into the house, weren't you?
>
> A.      No, I wasn't thinking about getting[,] about getting into the house.
>
> Q [M].  Okay. You were thinking about doing what?
>
> A.      I don't know.  Just I don't know.

(*Id.* at 84–85.)

Not primarily interested in Branham Drive, Mykes pivoted back to Quarry Hill, prompting another attempt by Sanchez to explain that he confessed only because of Wolff's and Hartley's unwillingness to accept any other answer:

> Q.      Okay.  Let me—I need to let you know about last Friday, Tyler.  There was a house that was broken into.  There was a very scared little girl.  You know what I'm talking about?  Did you ever get into a house and kind of scare a little girl?  Didn't see well, a little

bit scared?  No?

So apparently this morning you admitted to having scared a girl.  Is that inaccurate?

A.  Yeah.

Q.  Is that a lie?

A.  Yeah.

Q.  Then why did you say it?

A.  'Cause he was just going—

Q.  You don't have to talk about him.  I'm asking why you would say that then.  Tell me now.

A.  They weren't cooperating with me, 'cause if I said the wrong thing, they would just say, "Oh, you're lying. Oh, you're lying."  'Cause for some reason they kept thinking I was saying the wrong things.  And they—

Q.  Well, they knew you were saying the wrong things, and now you're telling us how you broke into houses. Come on now, man.

A.  But I didn't—I didn't do that.

Q.  You didn't do what?

A.  What you just said.

Q.  Scare a little girl?

Did you go into the house and hadn't planned on it, but all of a sudden you got seen by a girl and it scared her?

A.  No.

(*Id.* at 87–88.)  After further denials, Mykes eventually put the question more plainly:

Q.  Tyler, you know what?  With the games and this stuff, Tyler, I'm going to ask you point blank, okay?  Last week, did you climb in through a window and sexually assault a little girl?

A.  No.  I didn't.

Q. You didn't? You didn't?

A. No. I didn't. I can take a lie detector.

Q. You'd take a lie detector test?

A. Yes, I can.

(*Id.* at 90.)

Very little of substance occurred through the remainder of the interview as Mykes, Duffy, and Sanchez continued to talk in circles about what had really happened on the morning of the Quarry Hill sexual assault. Nonetheless, two statements from Sanchez are noteworthy. First, at one point, Sanchez emphasized that he had been "awake for over thirty hours now." (ECF No. 180-1 at timestamp 10:50:40.)[9] Second, when Mykes later asked to obtain a urine sample from Sanchez (to ensure he was not on drugs), Sanchez agreed but stated "I look like this most of the time . . . . * * * People ask questions, if I'm on anything, if I'm just tired . . . ." (*Id.* at timestamp 10:59:05.)[10]

The interrogation ended at about 11:30 AM, four hours after it started. (ECF No. 204 at 22, ¶ 65.) Sanchez was then returned to his jail cell. (*See* ECF No. 180-1 at timestamp 10:30:00.)

4. Mykes's and Duffy's Interview of Brian Coshnitzke

On the afternoon of the same day, Mykes and Duffy tracked down and interviewed the friend Sanchez named as "Brian," who turned out to be Brian

---

[9] The Court could not locate in the record any transcript of the last hour of Sanchez's interrogation, and will therefore cite to the video evidence itself.

[10] Mykes's request for a urine sample was actually a follow-up to something she had said near the beginning of the interrogation: "Q. And Tyler, I've got a question for you. I've got a few things. I want to talk to you about drugs and marijuana and things. No alcohol? Just tired? A. I haven't slept in like two days. Q. Okay. Call me crazy, but I'd kind of like to be sure. * * * Would you be willing to [give a blood or urine sample]?" (ECF No. 205-23 at 30–31.)

Coshnitzke. (ECF No. 204 at 22, ¶ 67.) Coshnitzke happened to be serving a short jail

sentence for a probation violation. (ECF No. 205-26 at 10.) Coshnitzke denied all

involvement in any crimes he supposedly committed with Sanchez, and when Mykes

asked Coshnitzke whether he believed Sanchez was capable of molesting a child,

Coshnitzke responded, "Tyler's a weird kid, man. I don't know what to say about Tyler.

He ain't all up there. He—he's different." (*Id.* at 43–44.) Later, Mykes had an

exchange with Coshnitzke specifically about what she perceived to be Sanchez's

oddities:

> Q. . . . Let me ask a real quick question about Tyler,
> 'cause he has some mannerisms that are a little
> interesting. Does he kind of phase off sometimes
> when you're talkin' to him? Or did he used to? Was
> that—
>
> A. Yeah.
>
> Q. Like zone out?
>
> A. He was weird. . . . He was a weird kid, man.
>
> * * *
>
> Q. I was just wonderin', [']cause like I said, when we
> talked to him, he kinda phased out a couple times.

(*Id.* at 51, 53.)

> 5. <u>Sanchez's Polygraph Examination with Dickson</u>

As described above, Sanchez volunteered to "take a lie detector" regarding the

accusation that he molested a child at the Quarry Hill address. Apparently prompted by

this, a DCSO sergeant (not a party here) contacted Defendant Dickson, an investigator

employed by the Office of the District Attorney for the Eighteenth Judicial District. (ECF

No. 175 at 3–5, ¶¶ 2, 14.) Dickson performs polygraph examinations as part of his

employment.  (*Id.* at 4, ¶ 9.)  He is certified to perform such examinations and has

performed between 300 and 500 of them.  (*Id.* at 4–5, ¶¶ 10–11.)

The DCSO sergeant who contacted Dickson did so on July 17, 2009 (the same

day Sanchez was taken into custody and interrogated), and asked Dickson to perform

the polygraph exam that same day.  (*Id.* at 5, ¶¶ 14–16.)  Dickson refused when he

learned that Sanchez had slept little the night before, but scheduled the examination for

the next day.  (*Id.* ¶ 16.)

A little before 9:00 AM the following morning (July 18, 2009), Mykes and Duffy

transported Sanchez to Dickson's office for the polygraph exam.  (ECF No. 204 at 23,

¶ 69.)  Dickson talked to Mykes and Duffy before the exam, and claims that Mykes and

Duffy "did not inform [him that] Mr. Sanchez had any cognitive limitations, was not very

smart, had trouble answering questions, became confused, had a bad memory, was

sleepy, was susceptible to suggestions, or that they had any difficulty interrogating

Mr. Sanchez."  (ECF No. 175 at 6, ¶ 22.)  Sanchez denies this: "Given [Mykes's and

Duffy's] observations of Mr. Sanchez and their prior interview, it defies credulity to

suggest that that information was not passed on to Detective [*sic*] Dickson."  (ECF No.

199 at 2, ¶ 22.)  The Court will return to this dispute in Part III.D.2, below.

In any event, the parties agree that investigation documents led Dickson to

recognize, before the exam, that Sanchez did not match the sexual assault victim's

description of the perpetrator.  (ECF No. 204 at 24, ¶ 70.)  In addition, Dickson "is aware

of the possibility of false confessions, has been trained that people with low IQs are

more susceptible to suggestion, and that to avoid false confessions, it is important to

find corroboration and to get details from the witness."  (*Id.* ¶ 71.)

Dickson's interactions with Sanchez (before, during, and after the polygraph exam) began just after 10:00 AM and were video- and audio-recorded. (ECF No. 175 at 7, ¶¶ 24–25.) A transcript of the audio is also in the record. (*See* ECF No. 205-32.) Mykes and Duffy observed all of these interactions as they happened, but from a different room. (ECF No. 175 at 7, ¶ 27.)

The first portion of Dickson's time with Sanchez was a "pre-polygraph interview." (*Id.* ¶ 24.) While asking some general questions, Dickson learned that Sanchez had slept about eight hours the previous night, and that on a scale of "[g]ood, fair or poor," Sanchez rated that sleep as "[g]ood." (ECF No. 205-32 at 15.) Dickson also learned from Sanchez that Sanchez had been prescribed some sort of medication "for seizures" that had begun three or four months earlier, although the actual effect of the medication was to help Sanchez sleep. (*Id.* at 15–17.) Sanchez confirmed that he had received a dose of this medication the previous night, in jail, before going to sleep. (*Id.* at 16.) A little later in the interview, Sanchez stated that his seizure disorder created "problem[s] with [his] memory." (*Id.* at 28.)

Following the pre-polygraph interview, Dickson administered the polygraph test itself, where the most significant questions were "Did you touch that girl's vaginal area while she was in her bedroom last July tenth?" and "About that girl in her bedroom last July tenth, did you touch her between her legs?" (*Id.* at 107.) The examination then concluded, and Dickson hand-scored the results. (ECF No. 175 at 10, ¶ 34.) He also entered the results into "a computerized scoring system called the Objective Scoring System." (*Id.*) Both Dickson's hand-scored result and the computer-generated result were consistent with deception on the relevant questions. (*Id.*)

Sanchez has retained a polygraph expert, Dr. Charles Honts, to testify regarding Dickson's examination.  (See ECF No. 205-31.)[11]  Dr. Honts opines that Dickson's questions were poorly formulated to generate accurate responses; that Dickson's scoring method was one of the least accurate methods he could have employed given the type of polygraph test he administered; and that a reasonable polygraph examiner would never have administered a test after observing Sanchez's inability to meaningfully communicate (which Dr. Honts found "obvious" from the video of the examination) and learning that his seizure disorder reportedly affects his memory.  (*Id.* §§ 4.2–4.3.)  Dr. Honts also examined the raw data from Sanchez's polygraph examination and hand-scored it himself.  (*Id.* § 4.1.)  He came up with a very different result, one that is "inconclusive of truthfulness or deception" but much closer to an indication of truthfulness than Dickson's score.  (*Id.* § 4.1.6.)  Given all of this, Sanchez accuses Dickson of "knowingly mis-scor[ing] the polygraph test" (ECF No. 199 at 3, ¶ 34) as part of a "cynical exercise" to extract a confession (ECF 204 at 27, ¶ 79 (internal quotation marks omitted)).  Sanchez and Dr. Honts say nothing about the computer-generated score that also suggested deception.

---

[11] Dickson objects that Dr. Honts's expert report is incompetent summary judgment evidence because it is "unsworn" (*i.e.*, not in the form of an affidavit or declaration).  (ECF No. 220 at 9, ¶ 73.)  The Court is frankly tired of addressing this utterly formalistic and baseless (yet surprisingly common) objection.  *See Pertile v. Gen. Motors, LLC*, 2017 WL 4237870, at *2 (D. Colo. Sept. 22, 2017).  The cases Dickson cites in support of his position—*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970), and *Sofford v. Schindler Elevator Corp.*, 954 F. Supp. 1459, 1462–63 (D. Colo. 1997)—have been abrogated on this point by the 2010 amendments to Federal Rule of Civil Procedure 56.  *See Pertile*, 2017 WL 4237870, at *2 & n.3. The proper question at summary judgment is whether the proffering party "is incapable of presenting its experts' intended testimony 'in a form that would be admissible in evidence [at trial].'"  *Gunn v. Carter*, 2016 WL 7899902, at *2 (D. Colo. June 13, 2016) (quoting Fed. R. Civ. P. 56(c)(2)).  Dickson does not attempt to show that Sanchez cannot bring Dr. Honts to testify at trial, or that Dr. Honts's opinions have not been adequately disclosed.  Dickson's objection is therefore overruled.

After scoring the exam, Dickson told Sanchez that his scores showed deception. (ECF No. 175 at 10, ¶ 35.)  Specifically, he told Sanchez that the computer scoring system showed a "point zero-zero-one percent probability that this result was produced by a truthful person.  In other words you failed badly on [the relevant questions]."  (ECF No. 205-32 at 110.)  Sanchez protested that he did not "remember doing any of this" and Dickson asked "could it have happened and you don't remember?"  After a pause, Sanchez answered, "It could have."  (*Id.* at 112.)  Sanchez later said, however, that "the only possibility" is that "I could have probably done it in my sleep."  (*Id.* at 117.)

Dickson continued to interview Sanchez, insisting that it would be better for Sanchez to confess fully now rather than later, when forensic evidence might make the case against him even stronger.  (*Id.* at 118–21.)  Sanchez then reconstructed in reasonable detail all of his whereabouts on the night and early morning in question, showing he had been nowhere near the Quarry Hill address.  (*Id.* at 122–23.)  Dickson responded, "Well I think you're lying to me again. * * * Otherwise you would have told me this stuff up front."  (*Id.* at 123.)  Similar to Mykes's approach in the interview on the previous day, Dickson eventually announced, "I know it happened.  I just need to know why it happened.  And I want to be able to help you say ... this is what happened so that ... people don't look at you differently."  (*Id.* at 125 (ellipses in original, indicating short verbal pauses).)  A short while later, Dickson re-urged essentially the same sentiment, and obviously caught Sanchez's attention:

> Q. And I want ... I want to give you the opportunity ... so that you can move on.  Otherwise you are gonna be stuck in this a lot.  And this is gonna be a significant thing in your life ... for a long time.  And I've been ........ .
>
> A. ......... And what do ........ .

Q.        ......... doing this almost thirty years.

A.        Like what do you mean by that?

Q.        Well, if you keep denying it ... this thing could drag out
           a long time. In terms of... you getting on with your life.

(*Id.* at 126 (ellipses in original).)  After further assertions to this effect, Sanchez

accepted from Dickson a pen and paper on which to write a confession.  (*Id.* at 128.)

After about twenty-five minutes of writing (*see* ECF No. 204 at 28, ¶ 81), Sanchez

produced the following (reproduced here verbatim, including errors):

> First when I got off work from a bad night, I decide to go chill
> out & go drive around in my car for a little while.  Then I just
> decide to go to Stonegate & drive around near there cause I
> had nothing to do & didn't want to go home yet.  So as I was
> driving around I decide to be stupid & try to get into a house.
> Then as I was driving, I see this house where that I can get
> to the second story window.  So then I parked my car far
> enough away from it so that I can run to it after.  After
> parking my car, I walked down to the house & started
> climbing ontop of the roof so where I can get to the window.
> Once I got into the window of the house I could barely see
> cause it was dark and all.  So I was looking around trying to
> find stuff then all of a sudden when I was feeling things all
> over the room trying to feel stuff, I felt something move & all
> of a sudden it was a little girl that started screaming so I
> quickly ran & jumped out the window.  Last, I went to my car
> & quickly went home.  And I want to say that I am sorry for
> everything & it will never happen again.

(ECF No. 175-10.)  Mykes later testified that every detail contained in this statement

about the crime itself was something law enforcement officers had suggested to

Sanchez beforehand.  (ECF No. 204-13 at 130.)

When Sanchez finished writing the foregoing, Dickson had him sign and date it

"7/18/09 2:13 P.M."  (ECF No. 175-10.)  Dickson also read the document aloud and

then began asking follow-up questions, particularly about how Sanchez got to the

second story window where he allegedly entered the home.  Sanchez was unsure and

could not remember how or where he climbed up, upon which Dickson asked, "Did you use a ladder?" (ECF No. 205-32 at 130.) Sanchez did not respond and Dickson then asked, "How'd you climb up?" Sanchez answered, "Well just a … ladder to get on the roof." (*Id.* (ellipses in original).) Dickson then inquired, "Who[se] ladder?" and Sanchez responded, "It was ... theirs." (*Id.* (ellipses in original).) But Sanchez could not remember where he had found "their" ladder. (*Id.* at 130–31.) A few minutes later in the interview, Dickson returned to the question of how Sanchez managed to get to the second story window, and Sanchez was once again unsure. Dickson asked, "So you're not sure if there was a ladder or not? 'Cause they didn't find one." Sanchez responded that he was "not sure." (ECF No. 204-26 at 04:13:10.) Sanchez was similarly vague about where the window was located on the house and how he jumped down without hurting himself. (ECF No. 204 at 30, ¶ 86.)[12]

After finishing his interview with Sanchez, Dickson spoke briefly with Mykes and Duffy, and then prepared a written report of the polygraph exam for the DCSO investigators. (*Id.* ¶ 89.)[13] Dickson understood that his report could be used as support for bringing charges against Sanchez. (ECF No. 220 at 13, ¶ 89.) Sanchez alleges that Dickson failed to note in his report "that he had lied to Mr. Sanchez about the polygraph results as a lever to compel a confession." (ECF No. 204 at 30, ¶ 89.)

---

[12] Sanchez claims, inaccurately, that Dickson admitted during his deposition that he came away from the polygraph examination with the impression that Sanchez "may have falsely confessed." (*Id.* ¶ 88.) The cited deposition testimony shows that Dickson had concerns about Sanchez's story regarding the ladder specifically, but the only way to spin this into a general concern about false confession is to treat Sanchez's attorney's questions as if they were Dickson's testimony—which, obviously, they are not.

[13] Sanchez says that Dickson prepared his report for the District Attorney's Office. (*Id.*) The deposition testimony Sanchez cites plainly states that Dickson prepared the report for DCSO, but also kept a copy on file at his office, which is the same as the District Attorney's Office (because he works for that office).

6. Sanchez's Second Interview with Duffy and Mykes

After Dickson left the polygraph examination room, Mykes and Duffy returned and began to question Sanchez again, hoping to fill in details not contained in his written statement. (*Id.* at 31, ¶ 91.) "He continued to show great difficulty in answering questions and to provide many nonverbal answers and physical indications of confusion and distress, and asked repeatedly for his parents." (*Id.*)

Sometime after this interview concluded, Mykes felt there was enough evidence of a potential cognitive disability (particularly Sanchez's slowness to respond to questions and his occasional staring off into space) to warrant further investigation. (ECF No. 204-9 at 28–29.) Regardless, that afternoon Mykes executed a Statement in Support of Warrantless Arrest to hold Sanchez on charges of sexual assault on a child, first-degree burglary, and unlawful sexual contact. (ECF No. 177-3.) This statement relied principally upon Sanchez's written confession and post-confession interrogation. (*Id.* at 2.) Mykes specifically requested a "bond deviation" so that bond would be set at $1 million, and the duty judge agreed. (*Id.* at 3.)

7. Sanchez's Father's Attempt to Bond Out Sanchez

At about 9:00 AM on the same morning as Sanchez's polygraph examination, Sanchez's father, Anthony Sanchez, arrived at the Douglas County Jail to post bond on the trespass charge. (ECF No. 204 at 23, ¶ 68.)[14] Mykes had received word the day before that Sanchez's parents planned to post bond "sometime" the next day. (ECF No.

---

[14] Sanchez asserts that his father arrived at 7:00 AM. (*Id.*) The cited deposition testimony from Anthony Sanchez establishes that he went to the bank first and then arrived at the jail "mid-morning, because the banks don't open until 9:00." (ECF No. 204-2 at 23.)

204-9 at 32.)[15]  But, by the time Anthony Sanchez arrived, Mykes and Duffy had already transported Sanchez to the District Attorney's Office for the polygraph.  (ECF No. 204 at 23, ¶ 69.)  Anthony Sanchez, unaware of this, posted bond at the Douglas County Jail and then waited—he was not told that Tyler was then being interrogated at a different facility.  (*Id.* ¶ 68.)

At 1:56 PM, while Mykes was observing Sanchez write his confession in the polygraph examination room, she received a page message from a DCSO sergeant which read as follows: "You need to call the lobby at [phone number] and talk to Sanchez's father about what is going on because he is getting really pissed because he cannot get his son out of jail.  He posted the bond at 0900 and we have no reason to hold him.  Sanchez needs an explanation.  This needs to happen now."  (ECF No. 205-33 at 2; ECF No. 205-34 at 2.)  Sanchez claims that Mykes saw these messages as they came in but chose to ignore them.  (ECF No. 204 at 26, ¶ 76.)  Mykes's memory at her deposition was that she had already spoken with someone at the Douglas County Jail before receiving these pages and had learned that Tyler Sanchez had bonded out, but told the jail that he was being held on new charges.  (ECF No. 204-9 at 39.)  According to Mykes, the pages were specifically requesting her to explain the situation to Anthony Sanchez.  (*Id.*)

At about 3:00 PM, Mykes got back to Anthony Sanchez to inform him that Tyler was being held on a new charge of sexual assault based on his written confession.  (ECF No. 204 at 32, ¶ 94.)  Anthony Sanchez immediately told Mykes something to the

---

[15] Sanchez claims, "Detective Mykes knew that . . . Anthony Sanchez would be coming to the jail *that morning* to bond out Tyler."  (ECF No. 204 at 23, ¶ 68 (emphasis added).)  Nothing Sanchez cites to support this statement shows knowledge that Anthony Sanchez would be coming specifically in the morning.

effect of "you had to know Tyler had no business talking to you within a couple of minutes of speaking to him."  (*Id.* (internal quotation marks omitted).)

At about 3:20 PM, a Douglas County public defender arrived at the District Attorney's Office (he had been alerted about Tyler's situation through Anthony Sanchez), announced that he was Tyler Sanchez's attorney, and demanded that the interrogation cease.  (*Id.* ¶ 93.)  Mykes and Duffy complied.  (*Id.*)  By that time, Sanchez had been in custody for about 38 hours and had spent about 15 of those hours being interrogated.  (*Id.*)

## D.    Continuing Investigation & Formal Charges

The next day (July 19, 2009), Duffy interviewed Anthony Sanchez.  (*Id.* ¶ 95.) Anthony Sanchez told Duffy that "Tyler is just quiet & does not communicate real well," that Tyler had attended special education classes in school, and that Tyler had not said his first word until age five.  (*Id.*)  Anthony Sanchez then signed a written consent to permit Duffy to obtain Sanchez's school records but the school itself refused and Sanchez's attorney twice moved to quash a subpoena directed at the school, which delayed Mykes's and Duffy's access to those records until August 2010.  (ECF No. 180 at 10, ¶ 25.)

On July 20, 2009, Mykes and Duffy recorded in certain case progress documents that they needed to interview Sanchez's acquaintances about his "cognitive abilities." (ECF No. 204 at 32, ¶ 96.)  Around this time, Mykes and Duffy interviewed Sanchez's coworkers at McDonald's.  (*Id.* at 33, ¶ 97.)  Mykes, however, does not believe that she specifically asked those coworkers about cognitive abilities, and Duffy currently has no recollection of doing so.  (*Id.* (evidence cited).)  They did learn, generally speaking, that Sanchez's boss believed Sanchez was smart, and his coworkers considered him a

good worker.  (ECF No. 180 at 10, ¶ 27.)  Also around this time, Mykes and Duffy interviewed Sanchez's girlfriend, who viewed Sanchez as "just a regular guy" who writes better than he speaks, and is particularly good at reading, writing, and math.  (*Id.* (internal quotation marks omitted).)

On July 22, 2009, Mykes drafted an Affidavit for Arrest Warrant for the sex assault charges.  (ECF No. 204-22.)  The affidavit—which was filed with the formal criminal charges (*see* ECF No. 204 at 35, ¶ 104)—extensively summarized the investigation, including all the officers' various interviews (although it does not report Dickson's conclusion that Sanchez failed the polygraph test).  It also quotes Sanchez's written confession, obtained after the polygraph exam, in full.

Mykes's warrant affidavit contains nothing regarding suspected cognitive difficulties, language difficulties, Sanchez's seizure disorder, or any expression of doubt regarding the reliability of Sanchez's confession.  However, the deputy district attorney assigned to Sanchez's case, non-party Brian Sugioka, claims that, around this same time, Mykes told him that "the confession was weird" and expressed at least three specific concerns to him along with potential responses.  (ECF No. 180-15 ¶¶ 4–6.)

The first concern, says Sugioka, was that Mykes knew that Sanchez did not match the sexual assault victim's description of the perpetrator.  (*Id.* ¶ 6.)  But the victim had also reported "that the perpetrator shoved her head into a pillow before jumping out the window, which means she would not have had a good view of the perpetrator and may [have] simply filled in some blanks in her recollection with descriptors that may have been inaccurate."  (*Id.*)  Second, Mykes knew that no ladder had been found at the scene, but Sanchez "had confessed to a number of trespasses over a long period of

time and we[16] concluded that he may have been confusing the sex assault break-in with another incident in which he had used a ladder." (*Id.*) Third, Mykes recognized that Sanchez "was slow to respond to questions during his interviews," but that "was not particularly unusual for suspects being interviewed, particularly when the interview is late at night." (*Id.*) Moreover, subsequent interviews with Anthony Sanchez and Sanchez's coworkers "resulted in a mixed bag of assessments of his abilities and intelligence." (*Id.*)

In October 2009, Mykes learned that Sanchez's DNA had not been found on the sexual assault victim's underwear. (ECF No. 204 at 38, ¶ 116.) And, at some point not far removed from Sanchez's arrest (the record does not disclose precisely when), Mykes concluded that it would have been "extremely difficult for a perpetrator to climb onto the second floor of the victim's home without a ladder" (again, no ladder was ever found), and that any jump from the victim's window would have been quite dangerous. (*Id.* ¶¶ 117–18.) Mykes also learned, contrary to Sanchez's story, that the victim's room likely would not have been very dark at the time of the sexual assault due to streetlights outside—and, in particular, that whether the victim's bed had been occupied or unoccupied should have been "easy" to see. (*Id.* at 39, ¶ 126; ECF No. 205-54 at 2–3.)

E. **Pretrial Proceedings**

1. The Bond Hearing

In November 2009, Sanchez's defense attorney, Iris Eytan, moved to reduce Sanchez's bond. (ECF No. 180 at 12, ¶ 33.) She stated that she had met and spoken with Sanchez and looked through his school records. (ECF No. 180-22 at 10.) Based

---

[16] It is not clear if "we" refers to Mykes and Sugioka, or if Sugioka is reporting Mykes's words more-or-less verbatim, meaning that "we" would more likely refer to Mykes and Duffy.

on that, she learned something "no one has known," which was that Sanchez's IQ is 70, which he is "able to mask pretty well . . . due to . . . embarrassment . . . of that . . . cognitive impairment. . . . [A]nd also because . . . somebody with a borderline . . . intelligence . . . might be socially awkward but . . . you can seem to have a communication." (*Id.* at 9.)  Eytan also pointed out that "it was acknowledged by the detectives in this case . . . not that he was cognitively impaired, although there're questions all over the discovery, question mark, cognitive impairment, question mark." (*Id.* (syntax in original).)  She announced that "the expert that . . . we've had look at the case" believed Sanchez's confession was false.  (*Id.* at 10.)  She further argued that Sanchez had simply repeated what he had been told.  (*Id.*)  She also made the court aware of Sanchez's hearing impairment and seizure disorder; that none of the other burglaries for which Sanchez was suspected turned out to involve him; that Sanchez did not meet the physical description of the sexual assault perpetrator; and that Sanchez's fingerprints and DNA had not been found at Quarry Hill.  (ECF No. 180 at 13, ¶ 34.)

The trial judge concluded that Eytan's arguments, when balanced against the fact that Sanchez had confessed and already had a minor criminal record before that confession, merited a bond reduction to $100,000.  (ECF No. 180-22 at 46–48.)

2.    The Preliminary Hearing[17]

Sanchez's preliminary hearing had originally been set for August 20, 2009.  (ECF No. 180-20 at 3.)  After various substitutions of counsel, continuances requested by

---

[17] Defendants are absolutely immune from any liability allegedly flowing from their testimony at the preliminary hearing.  *See Hinman v. Joyce*, 201 F. Supp. 3d 1283, 1291–94 (D. Colo. 2016).  Sanchez must therefore demonstrate that his damages flow from events that took place before the preliminary hearing.  The Court summarizes the preliminary hearing here for context and to address certain arguments Defendants make about the hearing's alleged preclusive effect (Part III.C.1, below).

defense counsel, and other procedural machinations, that preliminary hearing did not actually commence until March 30, 2010. (ECF No. 180 at 12–13, ¶¶ 31–32, 36.) It ended up spanning three days: March 30, April 27, and April 28. (*Id.* ¶ 36.) In their summary judgment papers, Mykes and Duffy summarize the preliminary hearing as follows, and Sanchez agrees that this is an accurate summary (*see* ECF No. 200 at 7, ¶ 38):

> The central issue at the hearing, as the prosecution characterized it, was whether Sanchez "was . . . coerced to confess or was he just saying yes because he either didn't hear what [was] asked of him or because he has some limited intellectual ability and was just saying whatever[.]" In Sanchez's defense, Eytan argued the following:
>
> - With respect to evidence: Sanchez had not been linked to other burglaries, Sanchez's DNA was not a match, and there was no ladder at the scene[.]
>
> - With respect to Sanchez's impairment: Sanchez suffered from hearing loss, memory loss, a seizure disorder and cognitive delays, Sanchez had a 71 IQ, Mykes and Duffy had suspected that Sanchez was on drugs, Sanchez had a developmental disability, the detectives did not "pick up" on the fact that Sanchez was mentally compromised and thought he was on drugs, and that "this case is not like others. It's just not. I don't know how many people in this courtroom, including the court have seen a case like this before."
>
> - With respect to Sanchez's interrogation and confession: Sanchez's written statement was manipulated, the detective used improper interrogation techniques, the confession was fed to Sanchez, the written statement was crafted and manipulated by the police, there was not anything in Sanchez's written statement that wasn't fed to him by law enforcement, cops are the author of Sanchez's ambiguous statement and the statement was "overborne."

(ECF No. 180 at 14–15, ¶ 38 (citations omitted; certain alterations in original; emphasis removed).)

At the conclusion of the hearing, the trial judge announced her ruling. (ECF No. 204-35.) She began by noting that the applicable legal standard required her to view the evidence "in the light most favorable to the People and [to] draw all reasonable inferences . . . in favor of the People." (*Id*. at 4.) Moreover, she said, she was not permitted to "make a determination as to the credibility of witnesses unless that testimony is incredible as a matter of law." (*Id*. at 5 (citing *People v. Fry*, 92 P.3d 970 (Colo. 2004)).) The trial judge then summarized Wolff's testimony about what he allegedly learned from Sanchez on the night Sanchez was arrested, including what he learned when Sanchez's "memory was refreshed . . . regarding the specific incidents, facts of that incident." (*Id*. at 8–9.) The trial judge next summarized Mykes's testimony about the sexual assault victim's account of what had happened in her bedroom on the night in question. (*Id*. at 9–10.) The trial judge then read Sanchez's written confession into the record, and concluded as follows:

> Again the court applying the appropriate standard considering the evidence the court does find that there is probable cause in this case to believe the only issue that was really before the court and that was whether the defendant, Mr. Tyler Sanchez committed these crimes and the court does find based upon there really not being any dispute as to whether a crime occurred, only as to who committed that there is probable cause as to counts 1, 2, and 3.

(*Id*. at 10–11.) Sanchez was therefore bound over for trial and pled not guilty. (ECF No. 180 at 15, ¶¶ 39–40.)

    3.    <u>The Various Psychological Evaluations</u>

        a.    *Dr. Baroffio's Opinions*

In May 2010, in response to Eytan's concerns about a false confession, Sugioka (the deputy district attorney) sought the opinion of a psychiatrist, Dr. James Barrofio.

(ECF No. 180 at 15, ¶ 41.)  The parties agree on the following summary of Dr. Barrofio's

opinions:

- The IQ test Eytan referred to was 9 years old and should be updated.

- There is a significant difference between Sanchez's verbal IQ and his performance IQ, suggesting a learning disability but not a cognitive disability.

- Sanchez's prior involvement in delinquent acts is consistent with a learning disability; that is, people in that circumstance tend to act out.

- A lot of people with learning disabilities learn to mask them and compensate for them.

- Sanchez is smarter than his 71 IQ suggests.

(*Id.* ¶ 42.)  Then, at a later court hearing, Dr. Barrofio testified essentially as follows:

- He had been retained by the prosecution to provide an opinion on Sanchez's psychology, intellectual ability and personality and whether his confession was false, resulting from suggestibility.

- His opinions were based upon a review of Sanchez's school records, the arrest affidavit and the various videotaped Sanchez interviews.

- He opined that Sanchez had an "auditory processing deficit," which he described as an inability to process information efficiently and effectively.

- He opined that Sanchez is not mentally retarded. He has "learning problems," but it is not black and white, but rather, "shades of gray."

- He opined that people with this type of disability, as a defense mechanism, purposefully appear to understand things when, in actuality, they may not.

- He opined that there was a significant difference between Sanchez's verbal IQ and performance IQ that he had reviewed and that this difference suggests that Sanchez had an "innate ability" to engage in "nonverbal concept

formation" that is substantively stronger than his verbal abilities.

- He opined that a person with a disability may use that disability to avoid responsibility.

(ECF No. 180 at 16–17, ¶ 48 (citations omitted).)  Based on this testimony, among other things, the trial judge ordered a competency evaluation.

     b.    *Dr. Bradley's Opinions*

The competency evaluation was performed by a psychologist, Dr. Mac Bradley. In relevant part, his eventual report concluded as follows:

- His school records indicate average to low average ability on reading, written language and mathematics. His receptive and expressive language scores were significantly lower.

- His verbal and full scale IQ scores were 82 and 65, and 79 and 71, respectively.

- His academic and verbal intellectual abilities appeared to be below average, but not significantly impaired.

* * *

- He could hear and understand conversational speech.

- He paused between question and response and struggled to express his thoughts.

- He had some difficulty with abstract concepts.

- Sanchez's thinking and speech was coherent, organized and logical.

- There were abnormalities in Sanchez's expressive language and his intelligence was low, but not extremely low.

- Sanchez "does not have a mental disability consisting of a substantial disorder of thought, mood, perception, or cognitive ability that results in marked functional disability."

- "It is my clinical opinion, within a reasonable degree of scientific certainty, that Tyler Sanchez does not have a mental or developmental disability that prevents him from having sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding in order to assist in the defense, or prevents him from having a rational and factual understanding of the criminal proceedings."

(*Id.* at 17–18, ¶ 50.)  The trial judge accordingly found Sanchez competent to stand trial.

(*Id.* at 19, ¶ 52.)  The trial judge then ordered a

> mental status evaluation "to determine whether the Defendant suffers from an intellectual disability, cognitive functioning impairment or speech and language disability that affected his ability to understand what he was told by law enforcement, to include any Miranda advisement and whether this intellectual disability, cognitive functioning impairment or speech and language disability affected his ability to provide accurate information and caused him to provide false inculpatory statements at the suggestion of law enforcement."

(*Id.* ¶ 53.)

c.    *Dr. Wheeler's Opinions*

The mental status examination was performed by Dr. Wheeler.  (*Id.* ¶ 54.)  As already noted in Part II.B, above, Dr. Wheeler diagnosed Sanchez with "mixed receptive-expressive language disorder, borderline intellectual functioning, auditory processing deficits, social anxiety, and submissive personality traits."  (ECF No. 204-1 at 109.)  This, "when combined with various situational and dispositional risk factors [such as fatigue], limited and impaired his ability to provide accurate information, and provides a reasonable basis for understanding his subsequent and current claim that the inculpatory statements at the suggestion of law enforcement were false."  (*Id.*)

## F.    Dismissal of the Prosecution

Anticipating that Dr. Wheeler's report would lead the court to grant a motion to

suppress the confession, Sugioka announced that lack of the confession would prevent

him from proving the case beyond a reasonable doubt, and he therefore dismissed all

charges on April 4, 2012.  (ECF No. 180 at 19, ¶ 55.)

**G.    Effect on Sanchez**

On account of the prosecution, Sanchez

> spent four months (125 days) in detention in the Douglas
> County Jail, much of it in solitary confinement due to his
> inability to protect himself from other inmates because of his
> disabilities.  Mr. Sanchez was not able to obtain his release
> on bond during this period of time because Defendants
> Mykes and Duffy requested that the Court deviate from the
> usual bond range and set his bond at $1 million, instead of
> $100,000.  For over five months (159 days) Mr. Sanchez
> was subjected to restrictions on his geographic location that
> prevented him from visiting his own home, required him to
> live with relatives, and required GPS monitoring.  He was
> also subjected to nearly two years (715 days) of restrictions
> on his geographic location that allowed him to return to live
> at his family home but restricted his movements and
> required GPS monitoring.

(ECF No. 204 at 46, ¶ 147 (citations omitted).)

## III.  ANALYSIS

**A.    Fourth Amendment Malicious Prosecution, Sanchez's Theory of Liability, and its Effect on Qualified Immunity**

1.    Elements

Through 42 U.S.C. § 1983, an individual may sue government officers for pretrial

detention without probable cause, in violation of the Fourth Amendment.  *Manuel v. City*

*of Joliet*, 137 S. Ct. 911, 917–20 (2017).  The Tenth Circuit refers to this as "malicious

prosecution," and states that its elements comprise at least the following: "(1) the

defendant caused the plaintiff's continued confinement or prosecution; (2) the original

action terminated in favor of the plaintiff; (3) no probable cause supported the original

arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Sanchez v. Hartley*, 810 F.3d 750, 754 n.1 (10th Cir. 2016) ("*Sanchez II*"), *cert. denied*, 137 S. Ct. 1372 (2017).

The Tenth Circuit also holds that "that the Fourth Amendment prohibits officers from knowingly or recklessly relying on false information to institute legal process when that process results in an unreasonable seizure." *Id.* at 754. The Tenth Circuit has never clearly stated where this requirement fits into the established elements of malicious prosecution.[18] This Court has generally treated knowing or reckless reliance on false information as a fact which, if proven, establishes the malice element. *See Sanchez v. Hartley*, 65 F. Supp. 3d 1111, 1124 (D. Colo. 2014) ("falsifying or omitting evidence knowingly and intentionally, or with reckless disregard for the truth is sufficient to establish malice in the context of malicious prosecution claims" (internal quotation marks omitted; alterations incorporated)) ("*Sanchez I*"); *see also Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991); *Grobecker v. Grundy*, 2014 WL 3593513, at *8–9 (D. Colo. July 18, 2014).

### 2. Sanchez's Theory

No Defendant challenges Sanchez on the second element (favorable termination) or the fifth element (damages) of his malicious prosecution claim. As to the remainder of the elements, Sanchez minces no words regarding what he intends to prove at trial. Sanchez repeatedly states that Defendants each subjectively concluded

---

[18] One decision, for example, equivocally suggests that knowing or reckless reliance on false information is part of both the malice element and the probable cause element. *See Wilkins v. DeReyes*, 528 F.3d 790, 799–801 (10th Cir. 2008) (analyzing effect of allegation that officers fabricated evidence under the heading, "Existence of Fact Questions as to Malice," although going on to discuss the question mostly in terms of a reasonable basis to find probable cause).

that they had extracted a false confession from Sanchez (or at least entertained serious doubts about the confession's veracity, which is enough to show reckless disregard), that each failed to disclose his or her subjective state of mind, and that each has continually lied since then about that state of mind. Sanchez was confined, he says, only because of Defendants' knowing or reckless reliance on his false confession, absent which probable cause would not have existed.

 3. Qualified Immunity

Defendants assert qualified immunity for materially the same reasons, which the Court finds helpful to address at the outset.

 a. *General Standard*

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The plaintiff bears the burden of demonstrating that the law was clearly established at the relevant time. *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation

marks omitted).  Nonetheless, the clearly established prong

> involves more than a scavenger hunt for prior cases with
> precisely the same facts.  The more obviously egregious the
> conduct in light of prevailing constitutional principles, the less
> specificity is required from prior case law to clearly establish
> the violation.  The Supreme Court has cautioned [lower]
> courts not to define clearly established law at a high level of
> generality, but to focus on whether the violative nature of
> particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and

citations omitted).

### b.    *Clearly Established Law Under These Facts*

Defendants appealed this Court's denial of qualified immunity at the pleading

phase, *see Sanchez I*, 65 F. Supp. 3d at 1125, arguing to the Tenth Circuit that the right

in question was not clearly established in 2009, and so qualified immunity applies,

*Sanchez II*, 810 F.3d at 759.  As relevant here, the Tenth Circuit summarized and then

rejected Defendants' argument as follows:

> . . . the defendants contend that the Fourth Amendment did
> not clearly require interrogators to (1) determine whether a
> suspect had cognitive disabilities or (2) accommodate these
> disabilities.  But this contention reflects confusion on
> Mr. Sanchez's claim.  Mr. Sanchez claims that the
> defendants either knew that his confession was untrue or
> recklessly disregarded that possibility.  If that was the case,
> the defendants would have violated the Fourth Amendment,
> regardless of whether they had a specific duty to ascertain
> and accommodate Mr. Sanchez's cognitive difficulties.

*Id*.  The Tenth Circuit further held that "the defendants should have realized [as of July

2009] that the knowing or reckless use of a false confession to institute legal process

would violate a clearly established constitutional right."  *Id*. at 760.

Defendants continue to urge qualified immunity on remand with an argument

materially no different than what the Tenth Circuit already rejected.  For example,

Hartley and Wolff assert that no clearly established law put them on notice "that failing to include information related to a potential cognitive disability that may or may not have revealed itself under questioning in an affidavit for warrantless arrest would violate a person's Fourth Amendment rights." (ECF No. 27 at 31.) Mykes and Duffy claim that "there was no Supreme Court or Tenth Circuit case that would provide notice to them that arresting Sanchez based on the evidence available to them at the time of the arrest . . . would violate his Constitutional rights." (ECF No. 180 at 33.) As on appeal, these arguments ignore Sanchez's actual theory, namely, that Defendants subjectively knew or recklessly disregarded the fact that Sanchez had falsely confessed. Thus, Defendants' argument for qualified immunity on this basis is as wrong now as it was on their earlier appeal and is, once again, firmly rejected.

Dickson offers a more nuanced argument particular to his circumstances. Dickson's argument turns on distinguishing *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004), a case on which the Tenth Circuit relied in *Sanchez II* to find that the relevant right was clearly established. *See* 810 F.3d at 760. In *Pierce*, the plaintiff was a man who had spent fifteen years in prison for rape until DNA evidence exonerated him; the defendant was a police department forensic chemist. *Id.* at 1281. During the underlying rape prosecution, the defendant tested biological samples taken from the plaintiff and reported that they were consistent with biological samples recovered during the investigation. *Id.* at 1282. The plaintiff alleged that the defendant's findings were false and knowingly fabricated. *Id.* The defendant argued that she could not be liable to the plaintiff because she had neither arrested the plaintiff nor made the decision to charge him with the rape. *Id.* at 1291. The Tenth Circuit rejected this argument:

> The actions of a police forensic analyst who prevaricates
> and distorts evidence to convince the prosecuting authorities
> to press charges [are] no less reprehensible than [those of]
> an officer who, through false statements, prevails upon a
> magistrate to issue a warrant. In each case the government
> official maliciously abuses a position of trust to induce the
> criminal justice system to confine and then to prosecute an
> innocent defendant. We view both types of conduct as
> equally repugnant to the Constitution.

*Id.* at 1293.

Dickson recognizes that Sanchez views him as in essentially the same position as the forensic chemist in *Pierce*. (ECF No. 175 at 27.) Dickson claims, however, that the defendant in *Pierce* was generating results that were "opaque to the remainder of the criminal justice process" given the scientific and technical complexity of the analysis, whereas the entirety of his interactions with Sanchez were observed by Mykes and Duffy and were video- and audio-recorded, so any other actor in the criminal justice process could personally evaluate his performance and whether he had extracted a valid confession. (*Id.*) In other words, Dickson says, he "did not use his expertise in a manner that could not be readily or easily checked by other participants in the criminal justice system." (*Id.* at 29.)

The problem with Dickson's argument is the same as it has been for all Defendants since this litigation began, *i.e.*, a stubborn refusal—or, at a minimum, a continuing failure—to accept that Sanchez accuses him of knowingly or recklessly extracting a false confession and then lying about it. When that allegation is accounted for, Dickson's argument is essentially that no clearly established law put him on notice of potential liability for knowingly or recklessly extracting a false confession where others (allegedly) could have discovered its falsity if they took the time to check his work.

This argument decisively fails for two reasons. First, the premise that other actors in the criminal justice process could have discovered his alleged misconduct is dubious. Sanchez alleges that Dickson intentionally failed Sanchez on the polygraph test as a means of coercing a confession. Proper administration and scoring of a polygraph test is not common knowledge among individuals untrained in these disciplines. Second, this contention, if accepted, would raise the bar for a § 1983 plaintiff in terms of establishing what constitutes "clearly established law" far beyond what can reasonably be supported by the controlling cases. The Court is fully aware of the Supreme Court's recent emphasis on defining clearly established rights with specificity, *see, e.g.*, *White v. Pauly*, 137 S. Ct. 548, 552 (2017), but the specificity Dickson seeks is absurd. *Pierce* established as of 2004 that a government official responsible for investigating a crime can be liable for malicious prosecution if that official knowingly or recklessly supplies false evidence against the accused. Dickson cannot reasonably claim that he needed further notice specifically that he could be liable even where other police officers, the prosecutor, the judge, etc., could have discovered for themselves that he introduced false evidence into the investigation. *See, e.g.*, *Perea*, 817 F.3d at 1204 ("involves more than a scavenger hunt for prior cases with precisely the same facts"); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) ("when an officer's violation of the Fourth Amendment is particularly clear from [already-established case law], we do not require a second decision with greater specificity to clearly establish the law").[19]

---

[19] Of course, an official who introduces false evidence into an investigation is not *necessarily* liable. If probable cause would have existed absent the false evidence, a malicious prosecution claim would fail on the probable cause element, as discussed below in Part III.C. Similarly, if the official can convince a jury that the prosecutor would have filed and pursued

In short, no Defendant can claim qualified immunity in this case *if* there is a genuine dispute of fact over whether that Defendant subjectively formed the opinion, or recklessly disregarded a serious suspicion, that Sanchez's confession was false. Stated somewhat differently, is there enough evidence from which a reasonable jury could agree with Sanchez that a particular Defendant has been lying about his or her state of mind since 2009? The Court must keep this question in mind for the remainder of its analysis. The Court now turns to the elements of Sanchez's claim that Defendants have variously challenged.

**B.     Causation**

1.     Wolff and Hartley

Wolff and Hartley argue that the causation element fails as to them because they "did not elicit [Sanchez's] confession to the sex assault[20] and did not prepare or participate in the submission of charges related to the sex assault." (ECF No. 184 at 17.) However, Sanchez's theory of causation against Wolff and Hartley is as follows: (1) they knew Sanchez had confessed falsely to the trespass and the sex assault, or recklessly disregarded a serious suspicion of falsity, which the Court will address in the context of the malice element, below (Part III.D); (2) they never told Mykes, Duffy, or Sugioka about this knowledge or suspicion; and (3) but for that failure, Sanchez would not have been turned over to Mykes and Duffy for further interrogation, or at least Sanchez would not have been charged with sexual assault. (ECF No. 198 at 9–12;

charges regardless of the false evidence, a malicious prosecution claim may fail on the causation element, as discussed below in Part III.B.

[20] This assertion is difficult to understand. It appears undisputed that Wolff and Hartley elicited from Sanchez an admission at least to breaking and entering into the Quarry Hill home. Perhaps Wolff and Hartley mean to say that they did not participate in eliciting Sanchez's *written* confession, but the Court finds no legal significance to that distinction at this phase.

ECF No. 204 at 14, ¶ 39.)  Sanchez also notes that Wolff and Hartley were primarily responsible for his trespass prosecution.  (ECF No. 198 at 11–12.)[21]

Assuming for present purposes that Sanchez can convince a jury that Wolff and Hartley are lying about their subjective states of mind when they interviewed Sanchez, there is no flaw in Sanchez's causation theory that merits judgment as a matter of law on this record.  There is certainly a lurking question about what Sugioka would have done had Wolff and Hartley disclosed a subjective belief in the falsity of Sanchez's confession—according to Sugioka, Mykes approached him with concerns at least similar to what Sanchez believes Wolff and Hartley should have expressed, yet Sugioka continued to pursue the prosecution.  (*See* Part II.D, above.)  Sanchez apparently sees no problem here because Sugioka actually dismissed the charges when he received Dr. Wheeler's opinion that there was a reasonable basis for viewing Sanchez's confession as false.  This, according to Sanchez, is evidence that Sugioka would have done likewise if Wolff and Hartley had expressed to him their alleged subjective belief in the confession's falsity.  (ECF No. 198 at 12.)

Sugioka's decision to dismiss the charges was made based on a belief that suppression of Sanchez's confession would prevent him from establishing guilt beyond a reasonable doubt.  That is not the same as concluding that probable cause would be lacking without the confession.  Thus, the fact that Sugioka dismissed the charges after receiving Dr. Wheeler's opinion does not necessarily suggest that he would have dismissed the charges based on Wolff's and/or Hartley's opinion that Sanchez had

_____

[21] At least in the papers before the Court, no party attempts to separate liability for malicious prosecution based on the trespass charges and liability for malicious prosecution based on the sexual assault charges.

falsely confessed. Nonetheless, a reasonable jury *could* conclude that Sugioka's behavior upon receiving Dr. Wheeler's opinion makes it more likely than not that Sugioka would have behaved similarly if Wolff and/or Hartley had come to him and expressed a belief that Sanchez's confession was false. Accordingly, the Court rejects Wolff's and Hartley's summary judgment challenge on the causation element.

### 2. Dickson

Dickson argues that the causation element fails as to him because of his limited role—he says he did no more than administer the polygraph test and report its results, while Mykes ultimately made the decision to draft an affidavit in support of arresting Sanchez on the sexual assault charges. (ECF No. 175 at 22–37.) Sanchez's claim, however, is that Dickson elicited a confession that he knew or strongly suspected to be false. Moreover, Sanchez's written confession was quoted verbatim in Mykes's warrant affidavit. (ECF No. 199 at 8–11.)

Assuming for argument's sake that Sanchez can prove that Dickson possessed a culpable state of mind, the Tenth Circuit's *Pierce* decision, discussed above, establishes that Dickson may be liable even though he did not draft the warrant affidavit.[22] Thus, Sanchez's claim against Dickson does not fail as a matter of law on the causation element.

### C. Probable Cause

Wolff, Hartley, Mykes, and Duffy argue that Sanchez's claim fails on the probable

---

[22] Dickson cites a Fifth Circuit decision, *Michalik v. Hermann*, 422 F.3d 252, 261 (5th Cir. 2005), for the proposition that only officers directly involved in preparing a warrant application may be liable under the Fourth Amendment for claims such as the claim Sanchez brings against Dickson here. (*See* ECF No. 175 at 24–25.) *Michalik* raises interesting questions in that regard, but the Tenth Circuit had already, by the time of the events in question in this case, decided in *Pierce* that liability extends beyond those directly involved in preparing a warrant application.

cause element. (ECF No. 180 at 24–26; ECF No. 184 at 18–21.)

1.    Effect of the Preliminary Hearing

Mykes and Duffy first argue that a state court judge already found probable cause at the conclusion of the preliminary hearing, and so this proceeding is an improper collateral attack on that finding. (ECF No. 180 at 21–23.) The Court rejected this argument at the pleading phase, *see Sanchez I*, 65 F. Supp. 3d at 1121–22, and nothing has changed since then. As previously explained, a police officer may not lie to or withhold material information from a judge and then hide behind a probable cause determination made by the judge based such testimony. *See id.*

In addition, the record now makes clear that the trial judge viewed the evidence in the light most favorable to the prosecution and refused to engage in credibility determinations. (*See* Part II.E.2, above.) These restraints do not bind a jury in a civil proceeding such as this one. Thus, this lawsuit is not an impermissible collateral attack on the preliminary hearing.

2.    Effect on Probable Cause After Subtracting Falsities and Adding Material Omissions

"The existence of probable cause is a complete defense" to a malicious prosecution claim. *Anthony v. Baker*, 808 F. Supp. 1523, 1526 (D. Colo. 1992). Probable cause exists where

> the facts and circumstances within the arresting officer's knowledge and of which [the officer] had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested. This is an objective standard, and thus the subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive. Whether a reasonable officer would believe that there was probable cause to arrest in a given situation is

based on the totality of the circumstances.

*Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011) (internal quotation marks and citations omitted; original alterations incorporated). Because probable cause is an objective standard, it may exist despite a police officer's false statements or material omissions:

> If an arrest warrant affidavit contains false statements, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit. Where information has been omitted from an affidavit, we determine the existence of probable cause by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.

*Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) (internal quotation marks and citation omitted).

Mykes and Duffy offer the following itemized list of facts asserted in Mykes's warrant affidavit that supposedly justify Sanchez's arrest regardless of any falsities or material omissions:

- A resident of Branham Drive in Parker had called 911 to report an intruder in dark shirt, pants and baseball cap in his back yard. When the intruder spotted him, he ran and jumped the fence, knocking over patio furniture as he ran.

- Sanchez was spotted leaving the scene of this attempted burglary wearing dark clothes that matched the description given by the victim.

- When stopped, Sanchez was observed to be sweating profusely and breathing heavily as if engaged in strenuous activity. (It is judicially noticeable that in Parker around midnight on July 17, 2009, the temperature was in the 50s [Fahrenheit].)

- After he was contacted, Sanchez put on a white hoodie over the dark clothes he was spotted in.

- Sanchez initially denied going into the backyard on Branham Drive, stating that he was merely driving through the neighborhood.

- Sanchez subsequently admitted to being in a back yard, but denied an intent to steal anything.

- Sanchez stated that he had previously broken into several cars at the nearby Cherrywood Apartments stealing, for example, sunglasses and $20.

- Sanchez confirmed that he had been involved in a vehicle theft and several other burglaries in the Parker area.

- He stated that, in some of the burglaries, he broke into houses with an acquaintance, Brian Coshnitzke.

- With Coshnitzke, he stole some medications, and jewelry.

- He identified a pawn shop where he and Coshnitzke pawned the jewelry.

- He stated he recalled previously being with Coshnitzke in a stolen vehicle.

- In one of several recent unsolved burglaries and attempted burglaries, the victim had described the suspect as wearing a white hoodie, like the one Sanchez wore.

- Among these burglaries was the one attempted burglary on Quarry Hill where an 8-year-old girl had been sexually assaulted.

- During a follow-up interview, Sanchez denied the sexual assault and agreed to take a polygraph.

- The polygraph indicated that Sanchez had been untruthful about the sexual assault.[23]

- When confronted with the polygraph results, Sanchez stated, "I could have done it. I just don't remember."

---

[23] This allegation does not appear in Mykes's warrant affidavit, but it does appear in her statement in support of warrantless arrest. (*See* ECF No. 182-10 at 2.)

- After the polygraph, in yet another interview, Sanchez repeated much of what he said in the allegedly false written confession, but he also added to it, stating that when the little girl startled him, he "accidentally" touched her between the legs.

- Sanchez was on probation for a felony criminal mischief charge.

- Sanchez had one current charge for violation of probation.

- Sanchez was now a suspect in three attempted burglaries, three completed burglaries, several vehicle trespasses and one vehicle theft.

(ECF No. 180 at 24–25.)

Contrary to Defendants' characterization, this list does not omit alleged falsities or include alleged material omissions. There is no need to address every possible addition or subtraction to this list. For present purposes it is enough to note that, under Sanchez's theory, all of the bullet points regarding crimes to which he confessed should be subtracted because Defendants knew those confessions were false—or those bullet points should at least be qualified with a statement expressing belief in their falsity or expressing substantial doubt about their truth.

In this light, a reasonable jury could agree with Sanchez that probable cause did not exist. *See DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir. 1990) (acknowledging that "the issue of probable cause ordinarily is for the judge rather than the jury," but in a civil suit for damages, it may be "a proper issue for the jury if there is room for a difference of opinion," particularly in "cases in which the officers made the [alleged] misrepresentations in an application for an arrest warrant"). Accordingly, summary judgment is not appropriate on the probable cause element.

**D.    Malice**

All Defendants argue that Sanchez's claim fails on the malice element.  (ECF No. 175 at 30–32; ECF No. 180 at 26–29; ECF No. 184 at 21–22.)  As previously discussed, the malice element encompasses the knowledge-or-recklessness inquiry.

Knowledge and reckless disregard are subjective states of mind.  Reckless disregard, in particular, "exists when the affiant in fact entertained serious doubts as to the truth of his [or her] allegations."  *DeLoach*, 922 F.2d at 622 (internal quotation marks omitted).  Absent a defendant's confession to knowledge or reckless disregard—and no such confession exists in the record—a plaintiff must prove at least one of these states of mind through circumstantial evidence.  Circumstantial evidence can include objective evidence, such as "obvious reasons to doubt the veracity of the allegations."  *Id.* (internal quotation marks omitted); *cf. Farmer v. Brennan*, 511 U.S. 825, 842–43 (1994) (holding in the Eighth Amendment deliberate indifference context that a prison official's "requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious" (citation omitted)).

However, allowing a jury to rely on inferences from objective evidence does not convert the knowledge-or-recklessness inquiry into an objective standard.  A negligence-like "should have known" conclusion is not enough to hold a defendant liable under § 1983, and "[a]llegations of negligence or innocent mistake are insufficient" to establish a reckless omission.  *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990) (internal quotation marks omitted; brackets in original).  Thus, objective evidence may only be used for its "must have known" value, if any.  Ultimately, the objective evidence

along with all other circumstantial evidence admitted at trial must be enough for a reasonable jury to find that a particular defendant in fact concluded in his or her own mind that his or her allegations were false (knowledge), or actually entertained serious doubts about whether those allegations were true (reckless disregard)—and that, to the extent the defendant denies having such a state of mind at the relevant time, the defendant is either lying or misremembering.

In the appeal from this Court's denial of qualified immunity at the pleading phase, the Tenth Circuit set forth six sets of allegations that, taken together, "plausibly support the required inference of the defendants' knowledge or recklessness." *Sanchez II*, 810 F.3d at 756–57. The question at summary judgment is whether Sanchez has developed enough evidence from which a jury could conclude that Sanchez's allegations are true. The Court will therefore evaluate each of the six sets of allegations in turn, although the Court finds that three particular sets of allegations, and part of a fourth, are best analyzed as one under the current record.

    1.   <u>Sanchez's Physical Appearance</u>

The first allegation the Tenth Circuit found relevant was that

> [t]he victim of the sexual assault gave a description of her attacker that did not suggest Mr. Sanchez. According to the victim, the attacker was roughly 40 years old, weighed about 190 pounds, had no tattoos, and had brown hair parted down the middle. Mr. Sanchez was only 18 years old, weighed only about 130 pounds, had prominently displayed tattoos on both arms, and had buzz-cut red hair. The detectives and investigator knew that Mr. Sanchez did not fit the victim's description of the perpetrator.

*Id.* at 756 (citations omitted).

Viewed in the light most favorable to Sanchez, he has introduced evidence from which a jury could conclude that all Defendants were aware of the discrepancy between

Sanchez's appearance and the reported appearance of the Quarry Hill perpetrator. (ECF No. 204 at 8, 10, ¶¶ 24, 29 (Wolff and Hartley); *id.* at 17, ¶ 51 (Mykes and Duffy); *id.* at 24, ¶ 70 (Dickson).)

### 2. Obviousness of Some Sort of Disability

The second allegation the Tenth Circuit found relevant was that "Mr. Sanchez has pronounced cognitive and developmental disabilities and IQ test scores in the 60s and 70s. These disabilities cause Mr. Sanchez to engage in noticeably unusual behavior." *Sanchez II*, 810 F.3d at 756. The third allegation is closely connected: "In interviews with the defendants, Mr. Sanchez had significant difficulty understanding and responding to questions." *Id.* The fifth allegation adds more:

> The detectives and investigator noticed Mr. Sanchez's unusual behavior. At one point, [Wolff and Hartley] asked Mr. Sanchez if he was simply saying what they wanted to hear. [Wolff] wrote that Mr. Sanchez had difficulty remembering details of his supposed crimes and had given vague answers. [Mykes and Duffy] suspected intoxication, asking Mr. Sanchez to take a urine test to verify that he was not under the influence of drugs or alcohol. And [Dickson] observed that Mr. Sanchez was behaving unusually and experiencing difficulty answering questions.

*Id.* at 756–57 (citations omitted). Finally, the sixth allegation notes, in part, that "Mr. Sanchez was unable to give any details regarding his involvement in the crime." *Id.* at 757. Each of these allegations goes to Sanchez's overall claim that his disability is open and obvious and therefore known to Defendants, or at least that Defendants subjectively perceived something sufficiently abnormal that caused them to doubt Sanchez's reliability.

This is the most contentious aspect of the entire case, and the Court now more fully understands why. Judging solely from Sanchez's portrayal of himself in his papers,

one gets the impression that he comes across as profoundly disabled—one with almost zero normal social functioning and very limited ability to form unique thoughts. However, the Court has viewed all of the many hours of interrogation footage submitted by the parties. Sanchez's behavior is at times somewhat unusual (such as, on a few occasions, smiling at certain questions with no apparent reason) and he sometimes displays what appear to be nervous tics (*e.g.*, repeatedly rubbing his hair with both hands, bouncing his leg). This is consistent with an outward manifestation of some sort of mental disability. On the other hand, contrary to his description of himself, Sanchez does not have much difficulty understanding questions; does not simply agree with every suggestion made to him by Defendants; and does not show an inability to answer questions with anything beyond a yes or no. Rather, he holds his own for quite a while against the various Defendants. A jury could reasonably come to see how a police officer in the same circumstances as Defendants might have concluded that Sanchez was simply an aimless, post-high school teenager who happened to be extremely tired at the time.

Regarding Sanchez's alleged difficulty in responding to questions, this again is a matter on which reasonable minds could differ. In truth, the only times during the audiovisually recorded interrogations that Sanchez has difficulty answering questions are when he is asked for details regarding his alleged crimes. At all other times, he is forthcoming and quick to answer, and appears clear-headed. Ironically, Sanchez's body language and slowness to answer after being asked for details is arguably just as consistent with feeling shame and therefore having difficulty finding the words (this is how Mykes, Duffy, and Dickson said they were perceiving it) as it is with actually not

knowing the details because he never committed the crimes.  In other words, a jury could reasonably adopt Defendants' view that the case reduces to "debatable evidence that [Defendants] missed something they should have picked up on—a masked borderline mental condition that was debated by the professionals and, even today, seems incapable of being articulat[ed] in less than ten words."  (ECF No. 180 at 29.)

Nonetheless, a reasonable jury could disagree regarding what the various Defendants must have known after interacting with Sanchez in person.[24]  Moreover, there is evidence that Wolff, Hartley, Mykes, and Duffy were all suspicious at least of intoxication.  A jury could conclude from that evidence that those four Defendants entertained some amount of doubt about the reliability of Sanchez's statements.  Wolff and Hartley asked Sanchez if he was simply stating what they wanted to hear—which could be a routine question or it could be evidence of subjective doubt.  A jury could find either way.  Mykes and Duffy, moreover, specifically noted a need to investigate a potential cognitive disability, and in fact did investigate it.  According to Sugioka, Mykes knew that something was "weird" and ultimately concluded that the investigation revealed equivocal facts, but a reasonable jury could conclude that she and Duffy[25] learned enough that they must have at least strongly suspected a false confession yet suppressed that doubt.

Dickson is a closer case.  There is no allegation that he suspected intoxication or

_____

[24] The Court recognizes that in-person interaction with Sanchez may create a different impression than what the Court can perceive from the video evidence.  Nonetheless, the jury will likely need to base their findings in significant part on the video evidence.  At least among the materials submitted at summary judgment, no other evidence is more probative of what the officers could have known about Sanchez by interacting with him at the time (more than eight years ago).

[25] Mykes and Duffy do not distinguish themselves in their summary judgment filings for purposes of liability.

other drug-induced behavioral oddities during his few hours of interaction with Sanchez. The major allegations against Dickson are (1) the allegedly open and obvious nature of Sanchez's disability; (2) the claim that Mykes and Duffy shared with Dickson their concerns about Sanchez's reliability before Dickson administered the polygraph test; and (3) the assertion that Dickson should never have administered the polygraph test under the circumstances, and purposefully mis-scored Sanchez's polygraph exam to extract a confession.

The Court has already discussed the first allegation (an allegedly open and obvious disability), which is supported at least by the fact that the various other Defendants showed signs that they perceived something unusual about Sanchez. If a jury finds that anyone interacting with Sanchez cannot help but learn that he has a disability that affects his ability to answer questions accurately or truthfully, a jury could conclude that Dickson must have recognized this as well, and should not have administered a polygraph exam.

The second allegation rests on Sanchez's claim that it "defies credulity" to deny that Mykes and Duffy shared with Dickson their concerns about Sanchez's cognitive abilities, his susceptibility to suggestion, and so forth. (ECF No. 199 at 2, ¶ 22.) This, of course, rests on a jury concluding that Mykes and Duffy subjectively perceived these or similar problems. Assuming as much, Sanchez's position here is nonetheless somewhat at odds with his larger theory of the case, *i.e.*, that the various Defendants each concluded or strongly suspected that Sanchez had a disability that would make his confession unreliable, but deliberately suppressed that conclusion or suspicion.[26]

[26] Sanchez has not alleged any sort of conspiracy between the various Defendants. (*See generally* ECF No. 52.)

Sanchez wishes to tell that story except as to Mykes's and Duffy's interactions with Dickson, with no explanation for Mykes's and Duffy's forthrightness in this single context. Nonetheless, there is nothing inherently implausible about Sanchez's position—a jury could reasonably conclude that Mykes and/or Duffy passed on at least a suspicion (similar to Wolff and/or Hartley allegedly passing on a suspicion of intoxication to Duffy). Indeed, Sugioka says that Mykes expressed concerns to him, which makes it plausible that she would express concerns to others.

The third allegation (that Dickson rigged the polygraph exam), is irrelevant, strictly speaking, to the question of Dickson's ability to recognize Sanchez's disability. Under Sanchez's overall theory, any authority figure asking questions of him will perceive his disability, and so the actual administration of the polygraph test should be just one more question-asking context in which that disability manifests itself. However, if the Court understands Sanchez correctly, his insistence that Dickson rigged the polygraph exam seems to be part of a broader accusation that Dickson wanted to get a confession regardless of its truth or falsity—which accusation, if believed by a jury, would be enough to show at least reckless disregard. This has nothing specifically to do with the obviousness of Sanchez's disability, but the Court finds it relevant to the overall analysis. And on that score, the Court further finds that Sanchez is prepared to introduce competent evidence to support his accusation.

In conclusion, the Court concludes that Sanchez has enough evidence to go to a jury on the theory that Dickson must have perceived Sanchez's disability.

3.    Fatigue

The fourth allegation the Tenth Circuit found relevant was that "Mr. Sanchez's unusual behavior in the interviews was amplified by fatigue. He had been awake for

over 30 hours by the end of the interviews, and he repeatedly told the defendants that he was tired and spoke with his eyes closed." *Sanchez II*, 810 F.3d at 756. This allegation has not been fully supported by discovery if "by the end of the interviews" includes the polygraph session with Dickson. Nonetheless, the video of the interview with Mykes and Duffy shows Sanchez's extreme fatigue during that time, and a jury could reasonably infer that he was also very tired during his earlier interview with Wolff and Hartley (the video for which no longer exists).

Dickson, once again, is a closer call. Sanchez told Dickson that he had received a good eight hours of sleep before the polygraph exam. On the other hand, Dickson knew that Sanchez had been awake for quite a while before that. Dickson also observed before the polygraph interview that Sanchez had been "yawning an awful lot" and "yawning in here big time." (ECF No. 205-32 at 99, 101.) On the record as currently presented, the Court cannot say that a reasonable jury would have insufficient evidence to conclude that Dickson could not have failed to perceive Sanchez's lingering fatigue, and likewise could not have failed to understand that such fatigue could affect the polygraph results—given that Dickson specifically asked to have the polygraph exam deferred until after Sanchez received a night's sleep.

4. <u>Agreement to Details Sanchez Did Not Supply</u>

The final allegation the Tenth Circuit found relevant was that

> Mr. Sanchez was unable to give any details regarding his involvement in the crime. Instead, Mr. Sanchez simply agreed to the details suggested to him. At one point, Mr. Sanchez agreed to an untrue detail that the investigator had posed (that Mr. Sanchez had climbed into the victim's second-story window with a ladder). As the investigator knew, no ladder was found at the scene.

*Sanchez II*, 810 F.3d at 757. The Court has already analyzed the first sentence of this

quotation in the context of whether Sanchez's disability was open and obvious. Nonetheless, it is also worth considering in the full context of this allegation, which raises an issue potentially but not necessarily connected to whether Sanchez has an obvious disability. Whether an individual agrees with details offered by the police has nothing necessarily to do with a diagnosable cognitive disability—extreme fatigue and a long period of questioning could lead some normally right-thinking persons to confess out of exasperation.

For summary judgment purposes, it is undisputed that Wolff and Hartley asked mostly yes or no questions and got Sanchez to agree to the details of the Branham Drive trespass largely by offering those details and asking for Sanchez's confirmation. It is further undisputed that there is no detail in Sanchez's eventual written confession to the Quarry Hill incident that had not been previously supplied to him by a police officer. Finally, it is undisputed that Sanchez agreed to Dickson's suggestion that he used a ladder to climb to the victim's window at the Quarry Hill address, when Dickson well knew that no ladder had been found at the site. Moreover, Sanchez backed away from that suggestion when Dickson informed him that police had not found a ladder.

5.    Synthesis

Sanchez has shown he is prepared to introduce competent evidence of the six factual scenarios that the Tenth Circuit endorsed as sufficient to establish knowledge or reckless disregard. The Tenth Circuit has further established that knowledge or reckless disregard in these circumstances would strip an official of qualified immunity. *Sanchez II*, 810 F.3d at 759. Thus, the qualified immunity question as to each Defendant turns on genuine disputes of material fact that a jury must resolve, and this case must accordingly be set for trial.

**E.  Municipal Liability**

Douglas County and DCSO are defendants in this action under a municipal liability theory of failure to train and supervise Mykes and Duffy.  (ECF No. 52 ¶¶ 98–101.)  Their only argument for summary judgment in their favor is that Mykes and Duffy committed no violation of Sanchez's rights, so they similarly may not be held liable.  (ECF No. 180 at 36–37.)  Because there is a genuine dispute of material fact regarding Mykes's and Duffy's liability, this argument fails at the present stage.

## IV.  CAUTION TO SANCHEZ'S COUNSEL

Sanchez hopes to convince a jury that Defendants are lying.  It is ironic, then, that Sanchez's counsel have on several occasions in their papers exaggerated or distorted evidence at this summary judgment phase.  (*See supra* nn.2–3, 5–7, 12–15.)  Sanchez's counsel are cautioned that the Court will tolerate no further misrepresentations or distortions as this case moves forward.  This case will be tried on the evidence that actually exists, not on Sanchez's counsel's mischaracterization of it.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  Defendants' various motions for summary judgment (ECF Nos. 175, 180, 184) are DENIED;

2.  A Final Pretrial Conference before the undersigned is hereby SET for **Thursday, December 21, 2017 at 10:00 a.m.** before the undersigned in Courtroom A801 of the Alfred A. Arraj United States Courthouse, during which conference the Court will set this case for a Final Trial Preparation Conference and jury trial; and

3.  No later than seven calendar days before the Final Pretrial Conference, the parties shall submit a proposed final pretrial order according to the form made

available at http://www.cod.uscourts.gov/CourtOperations/RulesProcedures/

Forms.aspx, and shall e-mail an editable copy of that document to

martinez_chambers@cod.uscourts.gov.

Dated this 26th day of October, 2017.

BY THE COURT:

_____
William J. Martinez
United States District Judge